PAS COMMUNICATIONS, INC.; Quality Transfer, Inc.; 1A Rob Moving; Reliable Maintenance, Inc.; K.E. Johnson Consultants, Inc.; and Riteway Magic Supply Company, Inc., Plaintiffs,

v.

SPRINT CORPORATION, Defendant.

No. 99–2182–JWL.

United States District Court,
D. Kansas.

April 6, 2001.

Nimrod T. Chapel, Jr., Garrett M. Hodes, Humphrey, Farrington & McClain, Independence, MO, Christopher D. Matchett, Matchett, Verbois, Futrell and Henchy, P.L.C., Baton Rouge, LA, D. Robert Webster, Neil E. Lucas, David K. Lee, Timothy E. Peterson, Bamberger & Feibleman, Indianapolis, IN, for Plaintiffs.

Randall E. Hendricks, Lawrence A. Rouse, David J. Rempel, Jason M. Hans, Rouse Hendricks German May PC, Kansas City, MO, for Defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

Plaintiffs, several minority-owned businesses, allege that defendant intentionally denied plaintiffs on the basis of race subcontracting opportunities in connection with defendant's various projects. In that regard, plaintiffs allege that defendant interfered with plaintiffs' civil rights in violation of 42 U.S.C. §§ 1981 and 2000d. This matter is presently before the court on two discovery motions-plaintiffs' motion to sanction defendant for failing to make disclosures required by Rule 26, for Rule 37 sanctions, and for leave to open discovery for a limited purpose (doc. # 263) and plaintiffs' motion for additional discovery (doc. # 275)—and several dispositive motions-plaintiffs' motion for summary judgment (doc. # 229); defendant's motion for summary judgment on plaintiffs' claims for damages (doc. # 231); defendant's motion for summary judgment on plaintiffs' Title VI claims (doc. # 233); defendant's motion for summary judgment against plaintiff PAS Communications, Inc. (doc. # 235); defendant's motion for summary judgment against plaintiff Riteway Magic Supply Company, Inc. (doc. # 238); and defendant's motion for summary judgment against out-of-town plaintiffs (doc. # 241). As set forth in more detail below, the court denies plaintiffs' motions for sanctions and for additional discovery and grants summary judgment in favor of defendant on all claims of all plaintiffs. Plaintiffs' complaint is dismissed in its entirety.

● **Plaintiffs' Motions for Sanctions and Additional Discovery**

On February 16, 2001, long after the close of discovery and one week after the parties fully briefed their respective motions for summary judgment, plaintiffs filed their motion for sanctions and to re-open discovery. The catalyst for plaintiffs' motion was, according to plaintiffs, a "startling" phone call on January 30, 2001 from an individual named Mike Hughes. Mr. Hughes avers that he is a member of defendant's Ad Hoc Committee and defendant's Leadership Committee for Sprint Supplier Diversity. By way of background, the Ad Hoc Committee was formed, according to defendant's evidence, to increase participation by women and minority contractors with respect to the construction of defendant's campus.[1] The

---

1. The "campus" is defendant's world head- quarters located in Overland Park, Kansas.

Ad Hoc Committee included representatives from defendant, J.E. Dunn (the primary contractor and general construction manager for the campus), Zimmer Management Company (defendant's representative with J.E. Dunn for the campus construction project), and various women and minority contractor associations. According to defendant, the members of the Committee were charged with identifying potential women and minority bidders for campus construction contracts. The Ad Hoc Committee, in turn, reported to the Leadership Committee, which included different representatives from J.E. Dunn and defendant.

In their motion for sanctions and to reopen discovery, plaintiffs attach Mr. Hughes' affidavit and a variety of documents given to them by Mr. Hughes that relate to minority contractor participation at defendant's campus or, more specifically, that relate to work done by the Ad Hoc Committee. According to plaintiffs, these documents (many of which were never disclosed by defendant) and Mr. Hughes' affidavit demonstrate that minority contractors were forced to complete a separate qualification process that majority contractors were not required to complete and that minorities were "excluded" from many campus bids. Plaintiffs further allege that, although the Ad Hoc Committee was supposedly created for the benefit of minority firms, the Committee essentially awarded African–American firms only janitorial contracts. While plaintiffs concede (as they must) that they learned of the existence of these Committees during the discovery process, plaintiffs contend that the documents obtained from Mr. Hughes and Mr. Hughes' testimony shed additional light on the role of these Committees with respect to minority contractor partic-

ipation at the campus. Plaintiffs seek to reopen discovery to depose various members of both Committees. In addition, plaintiffs move the court to sanction defendant for failing to disclose in its Rule 26(a)(1) disclosures the existence of the Committees, the identity of the members of the Committees, all documents reflecting the work of the Committees, and the role of the Zimmer Management Company with respect to defendant's campus project. Plaintiffs also move the court to sanction defendants for allegedly misrepresenting to the court Zimmer's role in defendant's campus project, for allegedly misrepresenting to the court that certain documents that it was ordered to produce did not exist, and for failing to disclose the name of a consulting firm that worked with defendant.

In their motion for additional discovery, filed just days ago, plaintiffs seek additional discovery in light of alleged "threats and attempts to intimidate" Mr. Hughes. According to plaintiffs, after submitting Mr. Hughes' affidavit in connection with their motion for sanctions and to reopen discovery (in which Mr. Hughes alleged, *inter alia*, that minorities were excluded from many campus bids and that African–Americans were treated differently from other contractors), Mr. Hughes was threatened by Ray Malone, an African–American who, according to plaintiffs, has contracts with defendant and is a member of the Minority Contractors Association ("MCA"). Shortly after Mr. Malone's alleged threat, Mr. Hughes was apparently terminated from his position as Director of the MCA. Plaintiffs assert that Mr. Malone and the MCA retaliated against Mr. Hughes for providing his affidavit in connection with this litigation.[2] Plaintiffs ask for additional

---

**2.** As plainly suggested by Mr. Hughes in his affidavit, Mr. Malone and other members of the MCA were "disappointed" in the sub-

stance of Mr. Hughes' affidavit because, in fact, some members of the MCA were working at defendant's campus.

discovery because, as plaintiffs baldly assert, these "attempts to intimidate and threaten Mr. Hughes can be attributed to Sprint."

● *Defendant's Alleged Failure to Disclose Information Required by Rule 26(a)(1)*

Plaintiffs first move the court to sanction defendant for failing to make adequate disclosures under Federal Rule of Civil Procedure 26(a)(1) concerning persons and documents relevant to supplier diversity at defendant's campus project or, more specifically, the application process for minority contractors seeking to do work at defendant's campus. In that regard, plaintiffs contend that defendant should have disclosed the existence of the Ad Hoc Committee and the Leadership Committee for Sprint Supplier Diversity, the names of all members of these committees, all documents (including correspondence) regarding the work of these committees, and the role of the Zimmer Management Company with respect to supplier diversity at the campus.

Federal Rule of Civil Procedure 37(a)(2)(A) provides that if a party fails to make a disclosure required by Rule 26(a), "any other party may move to compel disclosure and for appropriate sanctions." Rule 26(a), in turn, "imposes on parties a duty to disclose, without awaiting formal discovery requests, certain basic information that is needed in most cases to prepare for trial and make informed decisions about settlement." See Fed.R.Civ.P. 26(a)(1) advisory committee notes (1993). Rule 26(a)(1) provides in pertinent part:[3]

Except to the extent otherwise stipulated or directed by order or local rule, a party shall, without awaiting a discovery request, provide to other parties:

(A) the name and, if known, the address and telephone number of each individual likely to have discoverable information relevant to disputed facts alleged with particularity in the pleadings, identifying the subjects of the information;

(B) a copy of, or a description by category and location of, all documents, data compilations, and tangible things in the possession, custody, or control of the party that are relevant to disputed facts alleged with particularity in the pleadings.

See Fed.R.Civ.P. 26(a)(1) (emphasis added). Thus, the court must turn to plaintiff's First Amended Complaint[4] to ascertain what disputed facts were "alleged with particularity" concerning the campus project. See *Asia Strategic Investment Alliances Ltd. v. General Elec. Capital Servs., Inc.*, No., 95–2479–GTV, 1997 WL 122568, at *3 (D.Kan. Mar. 11, 1997) (before imposing sanctions under Rule 37 for disclosure improprieties, the court must first find a failure to disclose information required by Federal Rule of Civil Procedure 26(a) or 26(e)(1)).

In their First Amended Complaint, plaintiffs include only two paragraphs that specifically reference defendant's campus project—paragraphs 20 and 22. Paragraph 20 states that "Presently Sprint is involved in constructing its world headquarters, a project involving interstate commerce and a proposed budget believed to be in excess of Six Hundred and Sixty Million Dollars." This allegation does not indicate that plaintiffs applied for contracting opportunities at the campus

---

**3.** The language of Rule 26(a) as set forth here does not reflect the recent amendment to the rule as that amendment was not in effect at the time the parties filed their Rule 26(a) disclosures in this case.

**4.** It is undisputed that plaintiffs' First Amended Complaint is the relevant pleading for purposes of analyzing defendant's initial disclosure obligation.

and is simply too vague to require defendant to disclose general information about the application process for minority contractors seeking to do work at defendant's campus. See 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure § 2053 (2d ed. 1994) ("[T]here is no doubt that notice-giving is the goal of the particularity requirement in Rule 26(a)(1) and that failure to give sufficient notice about what is alleged should relieve the opposing party of any disclosure obligation."). Paragraph 22 states as follows:

> By its own admission Sprint has contracted with minorities at its worldwide campus site for approximately Twenty-Two Million Dollars or less than 4% of the total construction budget. By Federal law Sprint is required to contract at least 10% of its procurement activities with eligible minorities. Of the Twenty-Two Million it has contracted with minorities to date only a little more than Two Million Dollars has gone to African-American firms or less than .005% of the total budget notwithstanding the fact that African-Americans constitute the dominant minority in Kansas and Missouri. In short such contracts as are being awarded to minorities by Sprint disproportionately favor non-African-American contractors and overwhelmingly the vast majority of contracts Sprint is awarding go to majority owned companies to the detriment of plaintiffs.

This paragraph could be read to suggest that plaintiffs applied for but were denied contracting opportunities in connection with defendant's campus project (e.g., defendant awarded contracts to majority owned companies "to the detriment of plaintiffs").

■ At first blush, then, information concerning committees that allegedly participated in the solicitation and review of potential contractors for the campus project is arguably "relevant to disputed facts alleged with particularity" for purposes of Rule 26(a)(1)'s mandatory initial disclosure requirement. Thus, the burden is on defendant to establish that the information that plaintiffs allege should have been disclosed is not relevant to disputed facts set forth in plaintiffs' complaint. See *Mike v. Dymon, Inc.*, No. 95–2405–EEO, 1996 WL 674007, at *4–5 (D.Kan. Nov. 14, 1996) (where discovery sought appears relevant, party resisting discovery bears the burden of establishing lack of relevance). According to defendant, information concerning the Ad Hoc Committee, the Leadership Committee, and Zimmer has no relevance whatsoever to the types of contracts for which plaintiffs Riteway and PAS were allegedly qualified and for which they allegedly applied.[5] Specifically, defendant contends that the Ad Hoc Committee, the Leadership Committee and Zimmer were not involved in any way with the letting of contracts at the campus for janitorial services or for inside premises wiring. In support of its argument, defendant has submitted the affidavit of Cedric Rowan, an employee of defendant and a member of the Ad Hoc Committee since its inception in May 1999. Mr. Rowan averred that the Ad Hoc Committee was not involved in any way with the application process or bidding process for janitorial contracts or inside premises

---

**5.** Although plaintiffs failed to identify in their complaint any particular contracts for which they applied or submitted a bid, it is undisputed that four of the six plaintiffs—Quality Transfer, 1A Rob Moving; Reliable Maintenance, and K.E. Johnson—never applied for or bid on any particular contract in connec-

tion with defendant's campus project. Plaintiff Riteway, however, attempted to obtain janitorial contracts at the campus and plaintiff PAS arguably attempted to obtain wiring contracts at the campus.[6]

**6.** Explain whether PAS applied for contract campus work??

wiring. According to Mr. Rowan, the Ad Hoc Committee was not involved with the application process or bidding process for janitorial contracts because such contracts were operational contracts—contracts for goods and services after the construction of the campus was complete. Operational contracts, according to Mr. Rowan, were awarded directly by defendant without the involvement or participation of the Ad Hoc Committee.[7] As Mr. Rowan testified, the Ad Hoc Committee was involved only with construction contracts—contracts concerning the construction of the campus and awarded by J.E. Dunn, the primary contractor and general construction manager for the campus project. In other words, defendant was not responsible for awarding any contracts relating to the construction of the campus.[8] Mr. Rowan further testified that the Ad Hoc Committee was not involved with the application process or bidding process for campus wiring contracts because defendant, as a telecommunications company with expertise in wiring for data and phone services, decided that J.E. Dunn would not award these contracts but that defendant would award these contracts itself. Thus, the Ad Hoc Committee did not identify potential bidders for these contracts.[9] Mr. Rowan's statements concerning the process for campus wiring contracts are further supported by the affidavit of Wanda Holland, an employee of defendant who was involved with selecting the companies to receive invitations to bid, review-ing the bids, and awarding the contracts for inside wiring at the campus. According to Ms. Holland, the Ad Hoc Committee was not involved in that process.

In response to defendant's evidence, plaintiffs state in their papers that "[s]ome of the documents previously attached as Exhibit 7 show that the Ad Hoc Committee considered the qualifications of both janitorial and telecommunications firms." Plaintiffs fail to identify any particular documents within Exhibit 7 that allegedly show that the Ad Hoc Committee considered the qualifications of these types of firms. Exhibit 7, attached to plaintiffs' opening brief, is approximately two and one-half inches thick, contains countless randomly assembled documents with no obvious relationship to one another and, in many cases, contains several copies of the same documents. In many instances, Exhibit 7 contains only one page of a multi-paged document. In most instances, plaintiffs have failed to offer any explanation of the significance of a particular document and it is not possible from the face of these documents for the court to derive any significance from them. Nonetheless, the court has looked through the documents constituting plaintiffs' Exhibit 7 and has failed to uncover any documents supporting plaintiffs' statement that the Ad Hoc Committee considered the qualifications of janitorial and telecommunications firms. In fact, the documents buttress defendant's evidence. For example, meeting minutes from the initial Ad Hoc Commit-

---

7. According to Mr. Rowan, members of the Ad Hoc Committee were notified of upcoming campus operational contracts to be awarded by defendant only so that members might in turn notify their constituent businesses of those opportunities.

8. Plaintiffs do not allege that defendant used J.E. Dunn as a front to protect defendant from being the contracting party with respect to construction contracts.

9. Nonetheless, as explained by Mr. Rowan, because wiring contracts fell within defendant's budget for campus construction, such contracts were included on reports generated by defendant and Zimmer that listed minority contractors for campus construction. As these reports reflect, however, such contractors are identified not as subcontractors to J.E. Dunn, but as "other vendors" directly to defendant.

tee in May 1999 reflect that J.E. Dunn was responsible for approving contractors with respect to campus construction. A diversity participation report included in Exhibit 7 reflects that premises wiring contractors were not considered contractors with J.E. Dunn but were considered vendors separate and apart from Dunn's contractors. Other meeting minutes from Ad Hoc Committee meetings reflect that contracts for "operational services" were considered "other services" separate and apart from the services for which the Ad Hoc Committee sought potential bidders. Still other meeting minutes reflect the fact that the Ad Hoc Committee talked about creating another Ad Hoc Committee for the "procurement of vendors and goods and services for the campus once operational" and that non-construction and non-design related contracts were beyond the scope of the Committee's work. Finally, certain documents in Exhibit 7 reflect that "interested service providers" should contact Wanda Holland at defendant and that "interested subcontractors" should contact J.E. Dunn. In short, the court sees nothing in Exhibit 7 suggesting that the Ad Hoc Committee analyzed the qualifications of janitorial or telecommunications firms.[10]

In sum, defendant has established that information concerning the Ad Hoc Committee, the Leadership Committee and

Zimmer is not relevant to "disputed facts alleged with particularity" for purposes of Rule 26(a)(1) because those groups were not involved in the procurement process for janitorial or inside wiring contracts.[11] Because defendant had no obligation to disclose this information in connection with its mandatory initial disclosures, sanctions are not warranted. Moreover, plaintiffs are not entitled to additional discovery with respect to the Ad Hoc Committee, the Leadership Committee or Zimmer. Plaintiffs' motion with respect to these issues is denied.

● **Defendant's Alleged Misrepresentations to the Court about Zimmer**

Next, plaintiffs move the court to sanction defendant based on defendant's alleged misrepresentations to the court about Zimmer's role in the procurement process for defendant's campus project. In that regard, plaintiffs contend that defendant's prior representations to the court that Zimmer was not involved with contracts for operational services or premises wiring at the campus are patently false in light of documents recently obtained by plaintiffs from Mr. Hughes. By way of background, in August 2000, plaintiffs attempted to serve a subpoena to Zimmer in which they commanded the production of various documents and attendance for a deposition. In response, Zim-

---

**10.** Other than their general reference to Exhibit 7, plaintiffs offer only one example of a document that, in plaintiffs' opinion, reflects that the Ad Hoc Committee analyzed the qualifications of such firms. That document, a summary of African–American contractors working on the construction of the campus, states that "there are twenty AA firms that have been qualified to perform construction work on the [campus] project." (emphasis added). The list includes the name "Woodley Janitorial." As plaintiffs concede, however, the scope of Woodley Janitorial's work (or "Woodley Building Maintenance" as it is sometimes referred to in the record) concerning the construction of the campus was de-

fined as "construction clean-up." Although plaintiffs assert that Riteway could have performed construction clean up services, it is undisputed that such contracts were awarded by J.E. Dunn and not defendant.

**11.** Moreover, even assuming the remaining four plaintiffs did apply for contracts associated with the campus, there is no evidence that the Ad Hoc Committee, the Leadership Committee or Zimmer were involved with the procurement process for the types of contracts that these plaintiffs would have sought (i.e., janitorial, transportation or moving, diversity consulting).

mer filed an objection under Federal Rule of Civil Procedure 45(c)(2)(B) and defendant filed a motion for protective order and to quash the subpoena. The court heard arguments on defendant's motion at the final pretrial conference in September 2000. During those arguments, defendant's counsel stated to the court that the subpoena should be quashed in part because Zimmer had no involvement with operational contracts related to the campus such as janitorial contracts and that Zimmer had no involvement with premises wiring contracts. Although the court heard arguments on the merits of defendant's motion to quash, the court ultimately granted defendant's motion on procedural grounds—Zimmer filed an objection under Federal Rule of Civil Procedure 45 and plaintiffs, at the time of the final pretrial conference, had not filed a motion to compel. See Fed.R.Civ.P. 45(c)(2)(B).[12]

Plaintiffs now assert that defendant's statements to the court at the final pretrial conference and in its papers in support of its motion for protective order and to quash the Zimmer subpoena were false. In support of this assertion, plaintiffs refer the court to many of the same documents contained in plaintiffs' Exhibit 7, an Exhibit discussed above in connection with plaintiffs' Rule 26(a)(1) arguments. These documents fail to show that defendant made false statements with respect to Zimmer.

As set forth above, the documents reflect the distinction between construction contracts and operational contracts at the campus. While the documents reflect that Zimmer was involved in the process for soliciting and reviewing potential minority contractors for contracts associated with the construction of the campus, defendant has never denied that fact. But none of the documents reflect that Zimmer was involved in the process for soliciting and reviewing potential minority contractors for operational contracts or wiring contracts.[13] Thus, because plaintiffs point to no evidence demonstrating that defendant made false statements to the court regarding Zimmer, their motion with respect to this issue is denied.

● **Defendant's Alleged Misstatements to the Court about the Existence of Reports**

█ Plaintiffs also assert that sanctions are warranted based on defendant's alleged misstatements to the court about the existence of certain documents. In that regard, at the final pretrial conference, the court granted in part plaintiffs' motion to extend time to complete discovery and, inter alia, ordered defendant to either produce to plaintiffs "a copy of any internal reports since 1995 which break down by race and services of the nature and type provided by plaintiffs relating to contracts

---

**12.** Thus, plaintiffs' statement in their papers that defendant's "misrepresentations" about Zimmer "formed the basis for the Court granting defendant a protective order with respect to Zimmer" is disingenuous.

**13.** Plaintiffs, for example, highlight one sentence from defendant's Supplier Diversity Plan to support their argument that Zimmer was involved in soliciting and reviewing contractors for operational contracts and wiring contracts. That sentence, which is the very first introductory sentence of the Diversity Plan, states that Zimmer, Dunn and defendant agree to "commit to actively developing opportunities for the participation of qualified minority and women businesses MBE/WBE firms in all facets of the campus project by providing equal access to all procurement processes, including consulting, contracting, vendors, suppliers and concessionaires." Focusing on the phrase "all facets of the campus project," plaintiffs argue that this sentence demonstrates that Zimmer was involved in the procurement process for contracts beyond construction contracts. This argument lacks merit. In the absence of any other evidence that Zimmer was so involved, it is unreasonable to draw the inference that plaintiffs suggest.

let in the Kansas City, Des Moines or Omaha area or file a certification with the court that no such reports exist." See Court's Order of Sept. 13, 2000 at 2. Sprint averred that no such reports existed. In their motion for sanctions, plaintiff contend that this averment is "incredible" in light of a document in their possession (or, more specifically, a chart entitled "Campus Supplier Diversity Participation Report") that reflects the utilization of minority contractors at the campus and that was never produced by defendant. As defendant correctly notes in its response, this particular report was in plaintiffs' possession at the time of the final pretrial conference and, in fact, was discussed at the pretrial conference. Moreover, the court specifically excepted this report from its order regarding internal reports. See Transcript of Final Pretrial Conference at 107–08. Thus, this report fails to suggest in any way that defendant's certification was false. In their reply brief, plaintiffs do not respond to defendant's arguments concerning the diversity participation report and, instead, simply refer the court to another document authored by defendant that, according to plaintiffs, should have been disclosed in compliance with the court's September 13, 2000 order. This document is entitled "Sprint World Headquarters/Supplier Diversity Plan/Summary of African–American Contracts and Plans." The document simply lists African–American contractors who were qualified to perform construction work on the campus project. As such, the document does not relate to services of the nature and type provided by plaintiffs. Having wholly failed to show that defendant's certification was false, plaintiffs' request for sanctions is denied.

### ● *Defendant's Failure to Disclose B & C Associates as a Consultant*

 Finally, plaintiffs maintain that defendant should be sanctioned for failing to disclose the identity of B & C Associates, a consulting firm that has done work for defendant.[14] In their papers, plaintiffs allege that this consulting firm prepared a report for defendant about minority participation at the campus. Plaintiffs, however, have failed to support this statement with any evidence whatsoever. Mike Hughes averred that he met with consultants from B & C Associates "to provide information regarding [defendant's] utilization of minorities at the campus and other issues." [15] Plaintiffs do not offer any other arguments or evidence concerning defendant's failure to identify this entity. In response, defendant has submitted the affidavit of Frankie T. Jones, the President and Chief Operating Officer of B & C Associates. According to Mr. Jones, B & C's work for defendant was limited to "community assessment work, community relations and political issues." Mr. Jones further averred that B & C never evaluated or critiqued defendant's minority business enterprise program and never performed any analysis of minority business spend at defendant.

In the face of Mr. Jones' testimony, Mr. Hughes' vague statement that he provided "information" to B & C regarding defendant's utilization of minorities at the campus is insufficient to demonstrate that defendant should have disclosed B & C, particularly because plaintiffs have not provided the court with the language of the specific discovery request that they allege required defendant to disclose B & C. Similarly, to the extent plaintiffs con-

---

**14.** Plaintiffs indicate that they made a formal discovery request to defendant seeking the identities of diversity consultants hired by defendant and that defendant failed to identify B & C Associates.

**15.** Curiously, plaintiffs never even direct the court to Mr. Hughes' affidavit with respect to their arguments about B & C Associates.

tend that defendant was required to disclose B & C in connection with its Rule 26(a)(1) disclosures, Mr. Hughes' statement is simply inadequate to show that B & C was "relevant to disputed facts alleged with particularity."[16] For these reasons, plaintiffs' motion for sanctions and to reopen discovery is denied.

● *Defendant's Alleged Intimidation of Mr. Hughes*

■ Plaintiffs' motion for additional discovery to explore the circumstances surrounding Mr. Hughes' termination from his position with the MCA and defendant's alleged intimidation of Mr. Hughes is denied. Plaintiffs have provided the court with no evidence or suggestion that defendant was involved with or had any bearing on the decision to terminate Mr. Hughes from his position with the MCA or that defendant intimidated Mr. Hughes in any way. Mr. Hughes' affidavit states only that Mr. Hughes felt intimidated by Mr. Malone, J.E. Dunn and the Board of the MCA regarding his involvement in this litigation. There is no evidence that defendant discussed Mr. Hughes or the content of his testimony with Mr. Malone or anyone else associated with MCA. In the absence of any evidence of defendant's involvement, the alleged intimidation of Mr. Hughes and the termination of Mr. Hughes from his position with MCA are of no consequence to the issues before the court. The motion is denied.[17]

● *Motions for Summary Judgment*

Having determined that plaintiffs are not entitled to additional discovery, the court turns to the parties' motions for summary judgment.

● *Facts* [18]

Plaintiffs are six African–American owned businesses, each of which sought to

16. In any event, plaintiffs have failed to direct the court to any particular facts alleged in their First Amended Complaint that arguably mandated the disclosure of B & C pursuant to Rule 26(a)(1).

17. The court recognizes that plaintiffs have not yet filed a reply to their motion for additional discovery and that the time in which plaintiffs would be permitted to file a reply has not yet expired. However, even if plaintiffs were able to make a showing in their reply brief that defendant was somehow involved in the intimidation and/or termination of Mr. Hughes, additional discovery on this issue would only be relevant if the information sought was sufficient to save plaintiffs from the grant of summary judgment against them. Plaintiffs, then, were required to comply with Federal Rule of Civil Procedure 56(f). They have not done so and, thus, the court would deny plaintiffs' requested relief regardless of the contents of their reply brief. See *Price v. Western Resources, Inc.*, 232 F.3d 779, 783–84 (10th Cir.2000) (Where a party opposing summary judgment seeks additional discovery and fails to take advantage of the shelter provided by Rule 56(f) by filing an affidavit, there is no abuse of discretion in

granting summary judgment if it is otherwise appropriate.).

18. The court's task in setting forth the uncontroverted facts in this case is made much more difficult because plaintiffs, in their motion for summary judgment, have failed entirely to comply with Local Rule 56.1. The brief in support of plaintiffs' motion contains no statement of facts. Instead, plaintiffs have merely incorporated into the argument portion of their brief various factual statements, some of which are accompanied by citations to the record, some of which are not. Moreover, in response to defendant's complaint about plaintiffs' noncompliance, plaintiffs state only that "Sprint had no trouble" preparing a response to plaintiffs' motion. Plaintiffs' response to defendant's complaint and its failure to comply with the Local Rule are unacceptable and, as defendant highlights, grounds for this court to deny plaintiffs' motion for summary judgment. See, e.g., *Boyd v. Unified Govt. of Kansas City, Kan.*, No. 98–2439–KHV, 1999 WL 1467229, at *2 (D.Kan. Nov. 10, 1999) (striking plaintiff's motion for summary judgment for failure to follow Local Rule 56.1), *aff'd*, 242 F.3d 387 (10th Cir.2001). In this instance, the court will not strike plaintiffs' motion only because

provide services to defendant either by submitting bids for particular contracts or by notifying one of defendant's supplier diversity managers, Terry Smelcer, of their interest in working with defendant.

Plaintiff PAS is owned by Tom Turner. PAS is in the business of inside premises wiring. While PAS was successful in obtaining contracts with defendant in the early 1990s, it has not been successful in obtaining such contracts with defendant in recent years. For example, PAS submitted a bid for premises wiring work on a project in Las Vegas in 1998. It was not awarded that contract. PAS also bid for premises wiring work on a project at defendant's 6363 College Boulevard office in the Kansas City area in 1999. PAS was not awarded that contract, although defendant did award the contract to another African–American owned company.

Plaintiff Riteway is owned by Mark McAfee. Riteway provides janitorial services. Like PAS, Riteway has provided services to defendant in the past. In 1994, Riteway was awarded a contract for janitorial services in connection with one of defendant's offices in Independence, Missouri. Riteway eventually lost that contract to another African–American–owned firm because, according to defendant, defendant experienced numerous complaints about Riteway's performance of the contract. In any event, like PAS, Riteway has been unsuccessful in obtaining contracts with defendant in recent years. In 1998 and 2000, Riteway submitted a bid to provide janitorial services at defendant's office at 2330 Shawnee Mission Parkway in the Kansas City area. Both times the contract was awarded to Benz Janitorial, a majority-owned firm. Riteway also submitted a bid to provide janitorial services at defendant's new world headquarters (the "campus"). Defendant awarded those contracts to other African–American–owned janitorial companies.[19]

The four remaining plaintiffs never submitted bids for any specific contracts and, according to the record before the court, have never provided services to defendant. Rather, these plaintiffs approached one of defendant's supplier diversity managers, Terry Smelcer, at a trade seminar in Des Moines, Iowa in April 1997.[20] According to these plaintiffs, they specifically advised Mr. Smelcer that they were interested in providing services to defendant and provided Mr. Smelcer with written materials concerning the nature of their businesses. In that regard, Quality Transfer, owned by Cal Erwin, provides transportation and moving services. Similarly, 1A Rob, owned by James Robinson, provides transportation and moving services. Reliable Maintenance is owned by George McKay and is in the business of providing janitorial services. K.E. Johnson Consultants is owned by Keith Johnson and provides consulting services on diversity issues.

Additional facts will be provided as they become relevant to the issues before the court.

● *Summary Judgment Standard* [21]

the "facts" that are inadequately set forth in plaintiffs' motion are more adequately fleshed out in defendant's response to that motion, plaintiffs' reply and in connection with the papers regarding defendant's summary judgment motions. However, plaintiffs' counsel are strongly advised to familiarize themselves with the local rules of this court prior to filing papers with the court in the future.

**19.** Though it is outside the relevant limitations period here, Riteway submitted a bid to provide janitorial services at defendant's 110th Street and College Boulevard buildings in 1994. Another African–American–owned firm won those contracts.

**20.** These four plaintiffs are all based in either Omaha, Nebraska or Des Moines, Iowa.

**21.** Plaintiffs and defendant have filed motions

■ Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

■ The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

■ Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; see *Adler*, 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

■ Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

### ● *Plaintiffs' Section 1981 Claims*

In the pretrial order, plaintiffs claim that defendant denied plaintiffs contracts, including bid information about contractual opportunities, on the basis of plaintiffs' race in violation of section 1981. Plaintiffs move for summary judgment on their section 1981 claims on the grounds that, according to plaintiffs, the uncontroverted evidence establishes that defendant, as a matter of law, discriminates against African–American–owned businesses in general and has discriminated against these

---

for summary judgment on plaintiffs' claims. The court will address the motions together. The legal standard does not change if the parties file cross-motions for summary judgment. Each party has the burden of establishing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law. See *Atlantic Richfield Co. v. Farm*

*Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir.2000). Although the court will not automatically decide the case at the summary judgment stage merely because the parties have filed cross-motions for summary judgment, see *id.*, summary judgment is appropriate if there are no genuine issues of material fact.

plaintiffs in particular. Defendant moves for summary judgment on the grounds that plaintiffs have failed to set forth sufficient facts with respect to their prima facie case of discrimination and, in any event, that plaintiffs have failed to demonstrate that any actions taken by defendant were motivated, even in part, by racial animus and have failed to demonstrate that defendant's proffered reasons for its contractual decisions are pretextual. As set forth below, the court concludes that no reasonable jury viewing the evidence presented by plaintiffs in the light most favorable to plaintiffs could infer that defendant intentionally discriminated against plaintiffs on the basis of race. Summary judgment in favor of defendant is therefore appropriate.

 Section 1981 addresses racial discrimination in contractual relationships. See 42 U.S.C. § 1981(a) & (b). For purposes of summary judgment, the parties agree that, in the absence of direct evidence,[22] plaintiffs' section 1981 claims are analyzed under the burden-shifting framework developed under Title VII in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225–26 (10th Cir.2000) (McDonnell Douglas applied to section 1981 employment discrimination claim); *Pamintuan v. Nanticoke Mem. Hosp.*, 192 F.3d 378, 385 (3d Cir.1999) (McDonnell

Douglas applied to section 1981 discrimination in contracting claim); *Jackson v. Montgomery*, 999 F.2d 547, 1993 WL 261876, at *2 (10th Cir.1993); *Brown v. American Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir.1991) (same); see also *Asbury v. Brougham*, 866 F.2d 1276, 1279 (10th Cir.1989) (McDonnell Douglas applied to section 1982 claim for alleged discrimination in housing).

Pursuant to this framework, plaintiffs initially must make a prima facie case of discrimination. See *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir.1995). Once plaintiffs establish their prima facie case, the burden shifts to defendant to offer a legitimate, nondiscriminatory reason for its actions. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802–03, 93 S.Ct. 1817; *EEOC v. Flasher Co.*, 986 F.2d 1312, 1317–19 (10th Cir.1992)). If defendant comes forward with a nondiscriminatory reason for its actions, the burden then reverts to plaintiffs to show that the proffered reasons are pretextual, or unworthy of belief. *Id.* (citing *Ingels v. Thiokol Corp.*, 42 F.3d 616, 622 (10th Cir.1994)). This framework provides the governing law for determining what facts are material for summary judgment purposes.

### 1. Plaintiffs' Prima Facie Case of Discrimination

The parties agree that plaintiffs, for purposes of establishing their prima facie

---

**22.** At various points throughout their papers, plaintiffs contend that they have come forward with direct evidence of discrimination, thus obviating the need for a McDonnell Douglas analysis. Although it is not clear what evidence plaintiffs contend is "direct" evidence, none of the evidence set forth by plaintiffs—including the remarks allegedly made by Mr. Smelcer—constitutes direct evidence. According to established Tenth Circuit precedent, a "plaintiff proves discrimination by direct evidence when she presents proof of 'an existing policy which itself constitutes discrimination.'" See *Stone v. Autoliv*

*ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000) (citations omitted), *cert. denied*, —— U.S. ——, 121 S.Ct. 182, 148 L.Ed.2d 125 (2000). Even Mr. Smelcer's statements fall far short of this mark. See *id.* at 1136–37 (supervisor's comment that he did not know about the future of plaintiff's position as a result of company RIF, but that "at [plaintiff's] age, it would be difficult to train for another position" or "difficult to find a new job" did not constitute direct evidence of discrimination because the statement required a trier of fact to infer that discrimination was a motivating cause of the employment decision).

case, must show that they are minority-owned businesses; that they attempted to contract for certain services with defendant; that they were denied the right to contract for those services; and that such services remained available or were awarded to others outside the protected class. See *Jackson*, 1993 WL 261876, at *3 (setting forth prima facie elements for claim of contract discrimination under section 1981); *Brown*, 939 F.2d at 949 (same); *Asbury*, 866 F.2d at 1279–80 (setting forth similar elements of prima facie case for analogous claim of housing discrimination under section 1982).

In addition to the elements set forth above, however, defendant urges that plaintiffs, as part of their prima facie case, must demonstrate that they were qualified to perform the particular contracts that they were allegedly denied. This element is certainly supported by the case law. See, e.g., *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817 (in failure-to-hire context, plaintiff must show, inter alia, that he applied and was qualified for a job for which the employer was seeking applicants and that despite being qualified, the plaintiff was rejected); *Asbury*, 866 F.2d at 1280 (in section 1982 context, plaintiff must show as part of prima facie case that she was qualified to rent apartment in particular complex). Moreover, although plaintiffs' framing of the prima facie elements does not include a qualification element, they do not specifically object to defendant's use of

this element. In the end, however, the court need not resolve this issue because the court reaches the same conclusion with respect to plaintiffs' prima facie case regardless of whether it applies a qualification element at the prima facie stage.

The court turns, then, to apply the prima facie elements set forth above to plaintiffs' claims. Following the course charted by the parties in their papers, the court first analyzes plaintiffs' prima facie case with respect to specific contracts for which plaintiffs submitted an application or bid and then analyzes plaintiffs' prima facie case with respect to unidentified contracts that plaintiffs were allegedly denied.

### a. Specific contracts

 Only plaintiffs PAS and Rite-way have sought specific contractual opportunities with defendant.[23] The court turns first to plaintiff PAS and, more specifically, PAS's attempts to contract with defendant for the project in Las Vegas and the project in Kansas (the "6363 College" project). According to defendant, PAS cannot establish a prima facie case with respect to the Las Vegas project because the individual who made the award decision, Fernando Jordan, is African–American (and, thus, is in the same protected class as plaintiff PAS) and because PAS obtained several contracts with defendant in the early 1990s.[24] Based on these facts, defendant maintains that no inference of discrimination can be inferred. Defen-

---

**23.** Plaintiff Reliable asserts that it bid on a contract with defendant for a project in a suburb of Des Moines, Iowa. It is undisputed by Reliable, however, that this particular bid, submitted in 1995, falls outside the relevant limitations period.

**24.** Defendant also claims that PAS is not "qualified" for purposes of its prima facie case because of its practice of submitting "extraordinarily high bids." The amount of PAS's bid on the Las Vegas project, however, is defendant's proffered reason for not awarding the project to PAS. Under established Tenth Circuit precedent, defendant's reasons

for not contracting with PAS for the Las Vegas project should be considered in addressing whether those articulated reasons are legitimate or pretextual and not as a challenge to the sufficiency of plaintiff's prima facie case. See, e.g., *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1316 n. 11 (10th Cir. 1999). At the prima facie stage, the court need only conclude that the plaintiff has shown through credible evidence, including his own testimony, that he was minimally qualified for the position sought, even if the defendant disputes that evidence. *Id.* Thus, the court rejects defendant's challenge to

dant, however, points to no authority suggesting that such evidence precludes PAS from establishing a prima facie case. Thus, while such evidence may, in the end, undermine PAS's ability to show racial animus, see, e.g., *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 1002 (5th Cir.1996) (proof that all decisionmakers were members of the same race as complaining employee considerably undermines probability that race was a factor in employment decision); *Ziegler v. Delaware County Daily Times,* 128 F.Supp.2d 790, 812 n. 47 (E.D.Pa.2001) (inference of discrimination less where decisionmaker was member of same protected class as plaintiff); *Marlow v. Office of Court Admin. of New York,* 820 F.Supp. 753, 757 (S.D.N.Y.1993) (same), *aff'd,* 22 F.3d 1091 (2d Cir.1994), PAS has shown that it submitted a bid on the Las Vegas project, that defendant rejected that bid, and that the contract was awarded to a majority-owned firm. PAS has satisfied its prima facie case with respect to the Las Vegas project.

■■■■ With respect to the 6363 College project, in addition to its arguments made in connection with the Las Vegas project, defendant contends that PAS cannot establish a prima facie case because the contract was awarded to an African–American firm. In fact, PAS does not dispute that the contract was awarded to an African–American firm. Rather, PAS

attempts to controvert this fact only by arguing that defendant did not produce during discovery any documents identifying the firm to which the 6363 College contract was awarded. An alleged failure to provide documentary evidence is not grounds to controvert a fact that is otherwise supported by affidavit—particularly when plaintiffs have no evidence to controvert the information contained in the affidavit. In any event, defendant has provided with its papers copies of the bates-stamped documents that were apparently produced to plaintiffs—documents that specifically identify the name of the firm that won the 6363 College contract. Moreover, Tom Turner, PAS's owner, testified in his deposition that he had seen a minority contractor at the 6363 College job site and that he "assumed" that defendant has awarded the contract to that minority contractor. Simply put, PAS has offered no evidence whatsoever that the 6363 College contract was awarded to a majority-owned firm. Thus, PAS has failed to establish a prima facie case of discrimination with respect to the 6363 College project. See *Brown v. American Honda Motor Co.,* 939 F.2d 946, 949 (11th Cir.1991) (to establish a prima facie case in section 1981 contract discrimination case, plaintiff must show that the contract was "eventually given to an individual who is not a member of [the plaintiff's] protected class").[25]

PAS's prima facie case based on PAS's qualifications.

**25.** While the Tenth Circuit has held in the employment discrimination context that a plaintiff, for purposes of establishing a prima facie case, need not show that the position sought by that plaintiff was filled by someone outside the plaintiff's protected class, see, e.g., *Amro v. Boeing Co.,* 232 F.3d 790, 798 (10th Cir.2000), the Circuit has not specifically addressed this issue in the section 1981 contract discrimination context. In an unpublished section 1981 decision, however, the Tenth Circuit cited with approval the Eleventh Circuit's decision in Brown for Brown's discussion of the prima facie elements for a section 1981 contract discrimination claim. See *Jackson v. Montgomery,* 999 F.2d 547, 1993 WL 261876, at *3 (10th Cir.1993). In any event, the court need not decide whether the Circuit would require a plaintiff, as part of the plaintiff's prima facie case in a section 1981 contract discrimination claim, to show that the contract was awarded to someone outside the plaintiff's protected class. As set forth above, plaintiffs have conceded in their papers (indeed, their own framing of the prima facie elements requires) that they must show that the particular services remained

■ The court now turns to plaintiff Riteway and, more specifically, Riteway's attempts to obtain janitorial contracts with defendant for defendant's 2330 Shawnee Mission Parkway building in Kansas; Phase I and Phase II of defendant's campus; the Executive Hills buildings in Missouri; and defendant's 110th Street and College Boulevard buildings.[26] According to defendant, Riteway cannot establish a prima facie case of discrimination with respect to the janitorial contracts awarded for Phase I and Phase II of defendant's campus and with respect to the janitorial contracts awarded for defendant's 110th Street and College Boulevard buildings because those contracts were awarded to African–American firms. Indeed, it is uncontroverted that these contracts were awarded to African–American firms.[27] Thus, as explained above in connection with PAS's bid on the 6363 College project, Riteway has failed to establish a prima facie case of discrimination with respect to Phase I and II of the campus and with respect to the 110th Street and College Boulevard buildings.[28]

With respect to the Executive Hills buildings, defendant has come forward with evidence, in the form of an affidavit, that the buildings are not owned by defendant, that defendant has never controlled any janitorial service contracts on that property, and that defendant has never awarded any janitorial service contracts for those buildings. Thus, according to defendant, Riteway cannot establish its prima facie case with respect to these contracts. Specifically, defendant contends that Riteway cannot show that it attempted to contract with defendant and cannot establish that defendant denied Riteway the contracts. Riteway has failed to controvert these facts. In fact, in response to these facts, Riteway states only that it has "no knowledge" of what firm received the contract. This answer is simply not responsive to the particular facts set forth by defendant—it does not speak to the issue of whether defendant was the entity responsible for awarding janitorial contracts on the property. In any event, the answer is insufficient to controvert the facts asserted by defendant. See supra note 26. Thus, Riteway has failed to establish a

available or were awarded to others outside the protected class.

**26.** Riteway urges that it bid on more contracts than the ones specifically identified here. In his affidavit, for example, Mr. McAfee states that he traveled to Florida for the purpose of bidding on janitorial contracts in that state and that he met with one of defendant's contract negotiators about bidding on contracts in Florida. Nonetheless, Mr. McAfee fails to identify any specific contractual opportunities in Florida for which he submitted a bid or for which he would have submitted a bid if he had known about the opportunity. Thus, for the reasons set forth more fully below in part II.C.1.b. of this opinion, Riteway cannot state a prima facie case with respect to these unidentified opportunities.

**27.** In response to defendant's numbered facts concerning the award of these contracts to

African–American firms—facts that were properly supported by affidavits-Riteway simply states that it has "no knowledge" of what firms were awarded these contracts. A party's statement that it has no knowledge of the asserted fact does not controvert the asserted fact. See D.Kan. R. 56.1 ("Each fact in dispute ... shall refer with particularity to those portions of the record upon which the opposing party relies....").

**28.** Summary judgment would also be appropriate on Riteway's claims concerning contracts awarded at defendant's 110th Street and College Boulevard buildings because Riteway bid on the contract (and the contract was awarded) in 1994—well outside the relevant limitations period. In fact, defendant moves for summary judgment on this basis and Riteway has failed to address the argument in any fashion whatsoever.

prima facie case of discrimination with respect to the Executive Hills buildings.

■ Riteway has, however, satisfied its prima facie case with respect to the 2330 Shawnee Mission Parkway building. In that regard, Riteway has shown that it submitted a bid for the contract, that defendant rejected that bid, and that the contract was awarded to a majority-owned firm. Although defendant argues that Riteway cannot establish a prima facie case because the same decisionmakers on the 2330 building awarded a substantial percentage of janitorial contracts to African–American firms, defendant points to no authority suggesting that such evidence precludes Riteway from establishing a prima facie case.[29] Finally, defendant maintains that Riteway cannot establish a prima facie case because it cannot show that the successful bidder was "similarly situated" to it. As this court has previously held, however, a plaintiff need not demonstrate, for purposes of establishing a prima facie case in a section 1981 contract discrimination case, that the successful bidder was "similarly situated" to the plaintiff. See *Edwards & Assocs., Inc. v. Black & Veatch,* 84 F.Supp.2d 1182, 1193 (D.Kan. 2000). For these reasons, Riteway has adequately established a prima facie case with respect to the 2330 Shawnee Mission Parkway building.[30]

**29.** At the end of the day, however, such evidence may make an inference of discrimination less plausible.

**30.** Defendant also claims that Riteway is not "qualified" for purposes of its prima facie case because of its history of poor performance and high employee turnover. As set forth earlier in connection with PAS, defendant's arguments in this regard mirror defendant's proffered reasons for not contracting with Riteway on the 2330 building. Thus, the court will not consider this argument at this juncture. See supra note 23.

### b. Unidentified contracts

Aside from the specific contracts identified above, plaintiffs' claims are based on two theories. The first is that defendant, based on plaintiffs' race, denied plaintiffs the right to contract in general. Under this theory, plaintiffs assert that even though they did not seek or bid on a specific contract with defendant, defendant had notice that plaintiffs were interested in contracting with defendant but nonetheless failed to provide any contracting opportunities to plaintiffs as part of a pattern and practice of discriminating against African–American contractors. The second theory plaintiffs advance is that they were denied the opportunity to bid for any specific projects because defendant, on the basis of plaintiffs' race, intentionally withheld bid information from plaintiffs. Plaintiffs have not identified any specific contracts, under either theory, that they were allegedly denied. Stated another way, plaintiffs do not point to any particular contract that they contend they should have been or would have been awarded absent defendant's alleged discrimination.

■ Defendant maintains that plaintiffs cannot establish a prima facie case of discrimination with respect to these unidentified contracts. As an initial matter, defendant argues that plaintiffs cannot meet the second element of their prima facie case—that they "attempted to contract" with defendant.[31] According to de-

**31.** Defendant also contends that plaintiffs Reliable, Quality Transfer, 1A Rob and K.E. Johnson are not "qualified" for purposes of establishing a prima facie case. With respect to Reliable, defendant maintains that it was not qualified, at least with respect to janitorial contracts in Kansas City, because Reliable did not want to compete with Riteway for those contracts. In response, Reliable simply states that it was willing to "joint venture" with Riteway. Defendant's evidence with respect to Quality demonstrates that Quality, during the relevant time period, had no trucks, no employees and no income, and that Mr. Erwin did not have a commercial truck driver's

fendant, plaintiffs written and oral communications with Mr. Smelcer—a manager of supplier diversity for defendant's long distance division—are insufficient to put defendant on notice of plaintiffs' interest in any specific contracting opportunities. See *Whalen v. Unit Rig, Inc.,* 974 F.2d 1248, 1251 (10th Cir.1992) (in employment discrimination context, law does not require that a plaintiff formally apply for position in question; rather, law requires "either that the employer be on specific notice that the plaintiff seeks employment or, where informal hiring procedures are used, that the plaintiff be in the group of people who might reasonably be interested in the particular job"). Defendant contends that plaintiffs, at a minimum, were required to approach a decisionmaker in procurement about contracting opportunities.

The problem with defendant's argument, however, is that Mr. Smelcer, while admittedly not a person who makes procurement decisions, is not totally removed from the procurement process. In fact, Mr. Smelcer testified that it is his job "to identify and to introduce minority- and women-owned small business[es] to the buyers at Sprint and to the various departments so that they may have opportunities to compete for Sprint's business to provide products and services." Mr. Smelcer further testified that his department is "the contact" for minority- and women-owned businesses inquiring about contract opportunities with defendant and that he receives inquiries from these businesses in a

number of ways, including nonsolicited inquiries through the mail and by telephone. A reasonable jury could infer from Mr. Smelcer's testimony, then, that it would be appropriate for plaintiffs to contact Mr. Smelcer about doing business with defendant and that Mr. Smelcer would then be responsible for getting the word out to defendant's procurement personnel that plaintiffs were interested in providing goods and services to defendant. For this reason, the court concludes that plaintiffs have satisfied this element of their prima facie case.

 Next, defendant contends that plaintiffs cannot establish a prima facie case of discrimination because plaintiffs have failed to identify any specific contracts that they should have been or would have been awarded absent defendant's alleged discrimination. As the Supreme Court has emphasized, "in order to prove that she was denied the same right to make and enforce contracts as white citizens, [a section 1981 plaintiff] must show, inter alia, that she was in fact denied an available position." See *Patterson v. McLean Credit Union,* 491 U.S. 164, 187 n. 7, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) (emphasis in original); accord *Texas Dep't of Comm. Affairs v. Burdine,* 450 U.S. 248, 253 n. 6, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (for a prima facie case of racial discrimination, a plaintiff must show, inter alia, that he applied and was qualified for "a job for which the employer was seeking applicants"); *Anaeme v. Diagnostek, Inc.,*

---

license. Similarly, defendant's evidence shows that 1A Rob went out of business in September 1995 and that K.E. Johnson Consultants forfeited its corporate charter in August 1997. In response, Quality and 1A Rob simply state that they could get all necessary licenses with one week of obtaining a contract and could lease all necessary vehicles. K.E. Johnson states, without reference to any evidence in the record, that the "business is

viable." In short, the court doubts whether these plaintiffs were even minimally qualified for any contracts with defendant. Nonetheless, because the court concludes that these plaintiffs have failed to establish a prima facie case in any event, the court need not decide whether these plaintiffs have established that they were qualified to contract with defendant.

164 F.3d 1275, 1278 (10th Cir.1999) (To establish a prima facie case of disparate treatment as a result of the prospective employer's failure to hire, a plaintiff must show, inter alia, that he applied for an available position); *Randle v. City of Aurora,* 69 F.3d 441, 451 n. 13 (10th Cir.1995) (same).

In light of this principle, every Circuit that has addressed this issue has required a plaintiff, as part of that plaintiff's prima facie case, to come forward with evidence of a specific vacant position for which the plaintiff was qualified and on which the plaintiff's claim is based. See, e.g., *Brown v. Coach Stores, Inc.,* 163 F.3d 706, 711–12 (2nd Cir.1998) (affirming 12(b)(6) dismissal of plaintiff's failure-to-promote claim in part because plaintiff failed to allege the specific positions to which she would have applied had the alleged discriminatory practices not existed); *Weber v. American Express Co.,* 994 F.2d 513, 516 (8th Cir.1993) (affirming grant of summary judgment to defendant on plaintiff's failure-to-hire claim where plaintiff failed to generate a factual dispute on an "essential element" of his prima facie case—the availability of a position for which he was qualified); *Rush v. McDonald's Corp.,* 966 F.2d 1104, 1118 (7th Cir.1992) (affirming grant of summary judgment to defendant on plaintiff's failure-to-promote claim in part because plaintiff failed to show the existence of an available position); *Chavez v. Tempe Union High Sch. Dist. No. 213,* 565 F.2d 1087, 1091–92 (9th Cir.1977) (concluding that plaintiff failed to prove the existence of a job opening and thus failed to establish a prima facie case of discrimination in failure-to-promote context).[32]

In their papers, plaintiffs address this issue only by stating that the court has already rejected this argument in denying defendant's motion to dismiss plaintiffs' section 1981 claims. Plaintiffs, however, misconstrue the court's decision in that regard. Prior to discovery, defendant moved to dismiss plaintiffs' section 1981 claims on the grounds that plaintiffs, in their complaint, failed to identify any specific contracts that defendant allegedly denied them. The court denied the motion and concluded that the allegations in plaintiffs' complaint were sufficient under Federal Rule of Civil Procedure 8(a)(2) to state a claim for relief. The court also concluded, however, that "[a]dditional detail with respect to plaintiffs' section 1981 claims should be elicited through the discovery process." Discovery, of course, has long since closed and yet plaintiffs still have not identified any particular contracts that they were allegedly denied on the basis of their race. With any evidence whatsoever of specific contracts, the jury would be left to speculate whether defendant had even awarded any contracts during the relevant time period for which plaintiffs would have been qualified and able to perform.

In short, at this stage in the litigation, it is simply not sufficient for plaintiffs merely to assert that they were generally denied contracts on the basis of their race. See *Jones v. Unisys Corp.,* 54 F.3d 624, 631 (10th Cir.1995) (affirming summary judgment for employer; plaintiff failed to establish prima facie case of discrimination because he "did not identify specific jobs to which he claims he should have been transferred nor present evidence he was quali-

---

**32.** Similarly, the Tenth Circuit, albeit in an unpublished opinion, has required a plaintiff to identify a specific vacant position for which that plaintiff was qualified and on which his or her claim is based. See *Jackson v. Boeing Co.,* No. 92–3102, 1992 WL 372383, at *1 (10th Cir. Dec. 10, 1992) (affirming grant of summary judgment to defendant on plaintiff's section 1981 failure-to-rehire claim in part because plaintiff failed to designate any evidence showing that a position was available).

fied for such jobs"); accord *Mueller v. Greenlee Textron Inc.*, No. 93–1256, 1993 WL 312891, at *4 (7th Cir. Aug. 18, 1993) (affirming summary judgment for employer where plaintiff failed to present any evidence that there were actual job opportunities matching his qualifications; such information, if it existed, should have been available to plaintiff when he conducted discovery); *Madiedo v. Miami–Dade County*, No. 99–1422 CIV, 2000 WL 1763845, at *7 (S.D.Fla. June 1, 2000) (granting summary judgment for employer where plaintiff failed to identify any specific assignment she desired but did not receive; "[t]he bare allegation that [plaintiff] did not receive assignments she desired is insufficient to raise a material issue of fact as to whether the County discriminated against her"). Based on all of the authorities set forth above,[33] and in the absence of any persuasive argument from plaintiffs, it is clear that none of the plaintiffs can establish a prima facie case of discrimination based on the theory that defendant denied plaintiffs the right to contract or the theory that defendant withheld from plaintiffs bid information because none of the plaintiffs has identified a specific contract that they should have been or would have been awarded absent defendant's alleged discrimination.[34]

Plaintiffs Quality, 1A Rob, Reliable and K.E. Johnson's failure to identify specific contracts that they were allegedly denied is explained by defendant's evidence on

---

**33.** While these cases stem from the employment discrimination context, plaintiffs have not suggested (and the court has not uncovered any cases suggesting) that the rule is or should be otherwise in the contract discrimination context.

**34.** An argument can be made that if defendant deliberately prevented plaintiffs from learning about bid opportunities (by keeping plaintiffs' names off bid lists) on the basis of race, then a reasonable jury could find that defendant discriminated against plaintiffs even if defendant never awarded any contracts for which those plaintiffs would have been qualified. In other words, the mere fact that plaintiffs were kept off the bid lists on the basis of race would, in and of itself, constitute unlawful discrimination. However, plaintiffs K.E. Johnson, Quality, Reliable and 1A Rob have no evidence whatsoever that they were excluded from any bid lists (or that they took whatever steps were necessary to get placed on the bid list in any event). While Mark McAfee of Riteway averred that he requested that Riteway be placed on defendant's bid list, he does not suggest that his request was denied or that he was kept of any such lists. In fact, the evidence suggests that Riteway was on such a list—Riteway obtained a 1994 contract in Independence, Missouri and bid on several other contracts, including two separate contracts for defendant's former corporate headquarters. In short, there is simply no evidence that defendant concealed from Riteway information about bid opportunities. With respect to PAS, Tom Turner averred that in January 2001 a woman named "Amy" in defendant's National Accounts contacted him and said that PAS had not been receiving bid information related to national account opportunities in premises wiring because "her predecessor decided not to include PAS in its mailings of bid opportunities." This statement, however, carries little weight. Without any evidence of Amy's position, the statement, clearly offered to prove that PAS was kept off bid lists, is hearsay. In any event, Amy's comments to Mr. Turner does not suggest that PAS was not included in relevant mailings based on race. Finally, Mike Hughes (of defendant's Ad Hoc Committee) averred that "PAS Communications was excluded from the bid process related to telecommunications contracts for the Sprint campus." Mr. Hughes' affidavit, however, fails to explain the basis for his knowledge of this information. To the extent he purports to know this "fact" on the basis of his membership on the Ad Hoc Committee, it is uncontroverted (as discussed above in connection with plaintiffs' motion for sanctions and reopen discovery) that the Ad Hoc Committee had no involvement with premises wiring contracts for the campus. In the absence of evidence concerning the basis for his statement, Mr. Hughes' testimony concerning PAS's alleged exclusion from the campus bid process is inadmissible. See Fed.R.Evid. 602 & 701.

this issue. With respect to plaintiffs Quality and 1A Rob, defendant's uncontroverted evidence demonstrates that defendant has master contracts with companies like United Van Lines, North American Van Lines and Bekins Van Lines—national transportation companies providing services on a national basis.[35] Defendant's uncontroverted evidence further demonstrates that defendant has not awarded any transportation or moving contracts to any companies that only operate on a metropolitan or regional basis outside of Kansas City. Similarly, with respect to plaintiff Reliable, defendant's uncontroverted evidence demonstrates that defendant simply did not award any janitorial contracts in the Des Moines, Iowa metropolitan area during the relevant time period. Finally, defendant's uncontroverted evidence concerning K.E. Johnson is that all of defendant's diversity consulting contracts have been awarded to African–American–owned businesses and that defendant has never contracted with a majority-owned business to consult on supplier diversity issues.[36] Thus, even if plaintiff K.E. Johnson had identified these consulting contracts, it nonetheless would be unable to establish a prima facie case of discrimination as each of these contracts was awarded to an African–American firm.

In sum, PAS has established a prima facie case with respect to the premises wiring contract for the Las Vegas project and Riteway has established a prima facie case with respect to the janitorial contract for the 2330 building. The four remaining plaintiffs have failed to establish a prima facie case of discrimination because those

---

**35.** In an attempt to controvert this evidence, plaintiffs state only that defendant did not produce these contracts during discovery and, thus, should not be able to rely on the contracts for purposes of summary judgment. As defendant points out, however, it was not required to produce these contracts as the court previously held that defendant need not produce company-wide information about its contracts. Rather, because Quality and 1A Rob were unable to identify any specific contracts for which they had applied or for which they would have applied had they known about the opportunity, the court determined that defendant was only required to produce information concerning transportation and moving contracts awarded in the particular geographic areas of these plaintiffs. See *PAS Communications, Inc. v. Sprint Corp.*, No. 99–2181–JWL, 2000 WL 1867571, at *2–3 (D.Kan. Dec. 1, 2000). In other words, defendant has fully complied with its discovery obligations. Moreover, defendant's evidence concerning its national transportation and moving contracts is not supported by the contracts themselves but rather by affidavit.

**36.** In an attempt to controvert this evidence, plaintiffs reiterate the argument made in connection with the national moving and transportation contracts. That is, plaintiffs contend that defendant should not be able to rely on these contracts when it did not produce these contracts during discovery. For the same reasons set forth above, see supra note 34, the court rejects this argument. In any event, defendant does not rely on the actual consulting contracts themselves but on the affidavit of Mr. Smelcer. Plaintiffs also argue that the court should disregard defendant's evidence that diversity consulting contracts have been awarded to African–American firms because, according to plaintiffs, it only hired African–American firms for diversity consulting after plaintiffs filed their lawsuit. This argument lacks merit. First, plaintiffs direct the court to no evidence in the record supporting this assertion. Second, defendant's evidence demonstrates that it worked "quite extensively" with Reginald Williams, an African–American, on diversity consulting issues from 1989 through 1995. Along these same lines, plaintiffs argue elsewhere in their papers that "the award of contracts to African–Americans ... occurred essentially after this litigation was filed." Again, plaintiffs have failed to point to any evidence in the record to support this broad assertion. Indeed, the record evidence demonstrates otherwise. PAS did substantial work for defendant prior to the time plaintiffs filed suit, see infra note 39, and, as stated earlier, Riteway had a janitorial contract with defendant in 1994.

plaintiffs have failed to identify a specific contract that they should have been awarded absent defendant's alleged discrimination. Similarly, PAS and Riteway have failed to establish a prima facie case to the extent their claims are based on unidentified contractual opportunities.

### 2. Defendant's Proffered Reasons

 Because plaintiffs PAS and Riteway have set forth sufficient facts establishing the elements of their prima facie case of discrimination, the burden shifts to defendant to produce evidence of a legitimate nondiscriminatory reason for the challenged conduct. According to defendant's evidence, it did not select PAS for the Las Vegas project because PAS's bid was extraordinarily high-twice the amount of the successful bid. With respect to plaintiff Riteway and the 2330 building, defendant's evidence shows that it selected another janitorial firm, Benz Janitorial, because that firm was the incumbent provider for the 2330 building and had performed the contract satisfactorily for more than twenty years. Moreover, according to defendant's evidence, Benz had special training in video conferencing set-up and meeting set-up for corporate offices. Finally, defendant contends (and it's evidence supports the contention) that it had experienced prior performance problems with Riteway. In short, defendant has satisfied its "exceedingly light" burden to provide a nondiscriminatory reason for its actions.

See *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1279 (10th Cir.1999).[37]

### 3. Plaintiffs' Evidence of Pretext/Racial Animus

 To establish pretext, then, plaintiffs must show either that defendant's contracting decisions were more likely motivated by plaintiffs' race or that defendant's proffered explanations for its decisions are unworthy of credence. See *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1208 (10th Cir.1999); *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1317 (10th Cir.1999) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Here, plaintiffs have attempted to show both that defendant's proffered reasons are unworthy of credence and that defendant's contracting decisions were motivated by plaintiffs' race. As set forth in more detail below, plaintiffs have failed to establish that defendant's proffered reasons for its contracting decisions are pretextual under either of these approaches.

*Whether Defendant's Proffered Reasons are Unworthy of Credence*

In its summary judgment papers, defendant has submitted the affidavit of Fernando Jordan, a buyer in Supply Chain Management for defendant since 1995 and the individual who handled the award for the premises wiring contract on the Las Vegas

---

**37.** Even assuming plaintiffs had set forth a prima facie case of discrimination with respect to unspecified contracts that they were allegedly denied, defendant would nonetheless have satisfied its burden of articulating a legitimate nondiscriminatory reason for not awarding contracts to plaintiffs. Defendant, for example, states that it did not know that these plaintiffs were interested in particular contracts; that the plaintiffs did not apply for particular contracts; that the plaintiffs lacked even the most minimal qualifications; and that no opportunities were available. More-over, even assuming plaintiffs had established a prima facie case of discrimination concerning these unspecific contracts, the court would grant summary judgment in favor of defendant as plaintiffs have failed to establish pretext. In their papers, all plaintiffs (in support of all theories and claims) provide the same arguments with respect to defendant's racial animus. Thus, for the same reasons set forth herein concerning PAS and Riteway's inability to establish pretext, all other plaintiffs would similarly fail to establish pretext.

project. According to Mr. Jordan, PAS's bid was almost two times [38] that of the lowest bidder—the bidder to whom Mr. Jordan awarded the contract. Mr. Jordan further averred that he decided to award the contract to the lowest bidder and that he simply "could not justify" awarding the contract to PAS given its "extraordinarily high" bid. In an attempt to show that Mr. Jordan's proffered reason lacks credence, PAS first states that "there is no evidence properly before this court to support Sprint's allegation that PAS was the extraordinarily high bidder" because defendant allegedly failed to produce "alternative bids." While PAS's argument is not entirely clear, Mr. Jordan attached to his affidavit the "bid opening form" for the Las Vegas project reflecting that three firms bid on the Las Vegas project for premises wiring. The form shows that the lowest bid was from Tele/Data (the firm who won the contract) in the amount of $12,900.63 and that the highest bid was from PAS in the amount of $25,000. The other bidder, GNG Systems, submitted a bid of $19,950. Thus, defendant's uncontroverted evidence shows that only 3 groups submitted bids for the Las Vegas project and that PAS's bid was the highest. PAS's argument, then, lacks merit. PAS's only other argument regarding defendant's proffered reason for its decision on the Las Vegas project is that Mr. Jordan advised Tom Turner on one occasion that defendant has a practice of awarding contracts to the "best" bid rather than the lowest bid. This evidence fails to show that Mr. Jordan's proffered reason for selecting Tele/Data on the Las Vegas project is unworthy of belief. There is no evidence that Mr. Jordan did not believe that Tele/Data's bid was not only the lowest but also the "best." There is no evidence that

PAS's bid, despite being so high, was nonetheless the "best." In other words, the mere fact that defendant's policy was to select the "best" bid does not mean that defendant violated this policy by selecting the lowest bidder for a particular project, particularly in the absence of any evidence that another bid was "better." In short, PAS has failed to show that Mr. Jordan's proffered reason for selecting Tele/Data for the project lacks credence.

■ With respect to Riteway's bid on the 2330 building, defendant has submitted the affidavits of Nita Moden and Teri Craner, buyers in Supply Chain Management for defendant with responsibilities for awarding contracts for janitorial services. Ms. Moden handled the request for proposals in June 2000 for the 2330 building. According to Ms. Moden, Riteway's bid was rejected at that time in favor of the incumbent Benz Janitorial because Riteway's bid package was higher than Benz's package, because Benz had special training in conference room set-up and video set-up and because Benz had in place employees who had for several years satisfactorily performed their job duties at the 2330 building. Ms. Craner handled the request for proposals in 1998 for the 2330 building. According to Ms. Craner, she decided to award the contract to Benz because Benz had special training in conference room set-up and video set-up, because Benz's employees had performed their duties satisfactorily for years and because defendant had experienced performance problems with Riteway in 1994 and 1995 at a facility in Independence, Missouri. In response, Riteway states only that "[e]ach of these reasons is pretextual." Riteway fails to explain its statement,

---

**38.** PAS attempts to controvert the fact that its bid was "twice" the amount of the lowest bid by stating that its bid was $25,000 and the successful bidder's bid was $12,900.63. This pedantic argument lacks merit—Mr. Jordan averred that PAS's bid was "almost" two times the amount of the lowest (and successful) bid.

but simply refers the court to Mark McAfee's affidavit. The court has reviewed this affidavit in its entirety. None of the six paragraphs in Mr. McAfee's affidavit reference the 2330 contract—the paragraphs simply chronicle Riteway's general efforts to obtain work with defendant. Thus, Riteway has wholly failed to show that defendant's proffered reasons for awarding the 2330 contract to Benz are unworthy of credence.

### Comments Allegedly Suggesting that Defendant Denied Contracts to Plaintiffs Based on Race

Plaintiffs' claims are based in large part on comments allegedly made by Terry Smelcer in April 1997 at a trade seminar in Des Moines, Iowa held for the benefit of local minority contractors and attended by approximately 200 people. Mr. Smelcer, one of defendant's managers of supplier diversity, was the keynote speaker at the seminar.[39] In their papers, plaintiffs assert that during his keynote speech and in conversations with some of the plaintiffs after his speech, Mr. Smelcer essentially said that "African–Americans need not apply for work at Sprint." The court, then, turns to the specific evidence set forth by plaintiffs regarding Mr. Smelcer's comments.

Three plaintiffs (or, more specifically, the owners thereof) testified about the contents of Mr. Smelcer's speech at the trade seminar. The first, George McKay of Reliable Maintenance, testified that the substance of Mr. Smelcer's speech was not focused on defendant, but on all "big businesses" and how "big business[es] had to change their attitudes." According to Mr. McKay, Mr. Smelcer "talked about how difficult it would be for blacks, minorities to get work if there wasn't change in big

business attitude" and "talked about [how] it is good business to do business with minorities." Mr. McKay further testified that in his speech, Mr. Smelcer "mentioned Sprint several times and what they were trying to do." Mr. McKay did not remember Mr. Smelcer making any statements to the effect of "blacks need not apply." In short, Mr. McKay stated that Mr. Smelcer's "whole thing was talking about people changing their attitudes towards hiring minorities." Along these same lines, James Robinson of 1A Rob testified that Mr. Smelcer was a "good speaker" and that his speech was directed at businesses in general and was not focused on defendant. Mr. Robinson testified that he did not hear anything in Mr. Smelcer's speech indicating that defendant was racially biased in any way. Keith Johnson of K.E. Johnson Consultants, however, testified that Mr. Smelcer said "in so many words" that "if you are a person of color, you might as well not even apply, don't even bother, because Sprint ain't going to get it." According to Mr. Johnson, he "think[s] [Mr. Smelcer] was trying to portray what Sprint's attitude would be if we were to try to gain admission to Sprint economically by saying persons of color need not apply." As Mr. Johnson further testified, "What [Mr. Smelcer] was trying to do—and I looked back on this in retrospect. I think what he was trying to do was hep [sic] us to the situation. The doors aren't open at Sprint, period."

After Mr. Smelcer's speech, several of the plaintiffs (or owners thereof) had brief conversations with Mr. Smelcer. According to Mr. Robinson, although he could not relate the conversation "word for word," Mr. Smelcer "basically" said that

---

**39.** Defendant was one of a number of vendors represented at the seminar. Other vendors included U.S. West and Iowa Power.

Sprint was not ready for diversity and was not ready to accept Afro–Americans in the board room. And that was true for most board rooms across America, not just Sprint, but most board rooms across America. And I think that bears itself out. I think it was something to that nature.... Well, that is the way I interpreted it. Like I said, I couldn't give it to you word for word, and I can't say that that is his exact words. It is a long time ago. But what he was basically saying is that supplier diversity in—America was not ready for supplier diversity. And Sprint was one of them that wasn't quite ready yet, but they were working on it.

Cal Erwin of Quality Transfer testified that he had a five-minute conversation with Mr. Smelcer in which Mr. Erwin expressed an interest in doing business with defendant. According to Mr. Erwin, Mr. Smelcer "indicated" to him that "you and a lot of other people have been trying to do business with Sprint. We are trying to resolve some problems before we can get more minority businesses into Sprint. And when that time come[s], ... I will get back in touch with you." Mr. Erwin also testified that Mr. Smelcer said that at that particular time defendant was not using minority carriers.

Finally, Mr. McKay testified that he and his son spoke with Mr. Smelcer after the speech to ask Mr. Smelcer for work. Mr. McKay's testimony concerning his conversation with Mr. Smelcer is as follows:

And we was talking about, you know, the problems that we was having in Des Moines, Iowa. And he told us that Sprint has the same problem where they really don't want to do business with blacks, and he is working very hard to change that. He thought it was a very difficult process of having people think different. And he told us that Sprint does not want to do work with minorities.... They

was having a hard time doing work with minorities and that he didn't think that we would get any work from them.

According to Mr. McKay, he could not remember the exact conversation, but

that is the feeling that I—that is what he said in so many words. I can't quote him, because I remember, after he got done, me and my son just looked at one another and said this man just told us exactly what is going on, that they are not ready to do work with blacks, period.

■■■■■ The problem with plaintiffs' evidence of Mr. Smelcer's statements is that the statements constitute hearsay or are otherwise inadmissible under Federal Rules of Evidence 602 and 701. Of course, if evidence is not admissible at trial, neither is it admissible in an affidavit or deposition used to support or resist the grant of summary judgment. See Fed.R.Civ.P. 56(e); *Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1204 (10th Cir.2000) (for purposes of summary judgment, although evidence need not be in a form that would be admissible at trial, the content or substance of the evidence must be admissible). With respect to Mr. Smelcer's speech, the evidence suggests that Mr. Smelcer was authorized to make a presentation at the trade seminar concerning supplier diversity. Thus, while there is no evidence that defendant authorized or approved the specific content of Mr. Smelcer's speech, it is at least arguable that the speech itself is nonhearsay under the Federal Rules of Evidence. See Fed.R.Evid. 801(d)(2)(C) (statement is not hearsay if made by a person authorized by the party to make a statement concerning the subject). By contrast, the statements made by Mr. Smelcer in his private conversations with plaintiffs are hearsay. Plaintiffs clearly are offering those statements to prove

that, in fact, defendant does not award contracts to African–American contractors and do not want to work with minorities. Plaintiffs suggest that these statements are not hearsay because they are vicarious admissions under Federal Rule of Evidence 801(d)(2)(D). Under that rule, a statement is not hearsay if it is offered against a party and is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." See Fed.R.Evid. 801(d)(2)(D) (emphasis added). Here, there is no evidence that the alleged statements like "Sprint does not want to do work with minorities" were within the scope of Mr. Smelcer's agency or employment. There is no evidence, for example, that defendant used Mr. Smelcer as an agent to convey that particular message to attendees of the seminar. Cf. *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1081 (6th Cir.1999) (out-of-court declarant's statement is not hearsay under 801(d)(2)(D) where he was considered and used as an agent of defendant to convey a message to witness). There is no evidence that Mr. Smelcer had reason to know that defendant did not want to work with minorities. In fact, he was specifically hired to increase minority participation in defendant's contracts. Cf. *Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1093–94 (1st Cir.1995) (supervisor's statement purporting to convey management's desire for a younger workforce admissible under 801(d)(2)(D) where she attended management meeting shortly before management implemented RIF and purported to be communicating information acquired at the management meeting). There is no evidence that the statements were made in the course of Mr. Smelcer carrying out duties assigned to him by defendant. In that regard, it is uncontroverted that Mr. Smelcer's job duties included introducing potential minority contractors to defendant's buyers. Mr. Smelcer was not involved in the hiring or selection of contractors for any projects. He testified that he typically had no knowledge of the final results of a particular bid process (i.e., he had no knowledge of the successful bidder on any particular project). There is no evidence that Mr. Smelcer followed up on the status of any bids for any projects or that he had knowledge of how individual buyers made specific hiring decisions. While there is evidence that Mr. Smelcer would see reports reflecting how much business individual offices did with minority businesses, there is no evidence that he had knowledge of the reasons underlying the selection of one contractor over another or that he had any knowledge of the particular applicant pool for a given project. Cf. *Hybert v. Hearst Corp.*, 900 F.2d 1050, 1053 & n. 6 (7th Cir.1990) (supervisor's statements to the effect that "people in upper management were bent on replacing older salesmen with younger salesmen admissible under 801(d)(2)(D) where statements were made in the course of supervisor carrying out duties regarding plaintiff's retention—duties which were assigned to him by management"); accord *EEOC v. Learonal, Inc.*, No. 93–C–2950, 1994 WL 530711, at *2–3 (N.D.Ill.1994) (manager/recruiter's statement that "corporate" was "going for … in the younger—20 to 30 range" because the company was "looking for longevity" admissible under 801(d)(2)(D) where evidence established that manager/recruiter gave older applicant follow—up information about status of application, made hiring recommendations, sent offer letters to candidates, and almost all hiring and firing recommendations were followed; in short, recruiter was "very influential" in hiring

process so hiring decisions were within the scope of his employment).

■ In any event, regardless of whether Mr. Smelcer's statements constitute hearsay, the statements are nonetheless inadmissible under Federal Rule of Evidence 701. That rule provides, in pertinent part, that

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness. . . .

Fed.R.Evid. 701 (2001). Plaintiffs point to no facts explaining how Mr. Smelcer learned of defendant's alleged reluctance to do work with minorities. There is no evidence that he participated in meetings with buyers in which hiring policies or preferences were discussed. There is no evidence that he overheard buyers expressing reluctance to work with minorities or that he heard anyone with policy-making authority express the view that defendant did not want to do work with minorities. There is no evidence that Mr. Smelcer in any way perceived such reluctance on the part of defendant's buyers. In short, nothing in the record indicates the basis for Mr. Smelcer's statement that "blacks need not apply" or that defendant "does not want to do work with minorities." Without such evidence, Mr. Smelcer's generalizations about defendant's policies or preferences regarding the hiring of minority contractors are inadmissible. Compare *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1544 (10th Cir.1995) (coworker's statement that supervisor "had a problem with women who were not between the ages of 19 and 25 and who weighed more than 115 pounds" inadmissible under Rule 701 because statement not based on coworker's personal knowledge of any statement the supervisor may have made about his preferences concerning a

woman's appearance) and *Connell v. Bank of Boston*, 924 F.2d 1169, 1177–78 (1st Cir.1991) (senior bank officer's statement that bank decided to "eliminate more of the senior employees through other methods of reduction in force" inadmissible under Rule 701 where officer failed to explain how he learned of bank's intentions, failed to point to facts buttressing his broad assertion, and nothing in affidavit indicated basis for officer's information) with *Haun v. Ideal Indus., Inc.*, 81 F.3d 541, 548 (5th Cir.1996) (supervisor's statement that defendant was deliberately phasing-out older workers properly admitted as opinion of lay witness where supervisor testified that he had been told to "build a case" against an older worker; remarks had been made about his own age; defendant aggressively pushed older workers into early retirement; and a human resources official told him that the company president would not approve a particular candidate "because of his age").

■ For the same reasons, Mr. Smelcer's statements are inadmissible under Federal Rule of Evidence 602. Under this rule, a witness must have personal knowledge of a matter in order to testify about the matter. See Fed.R.Evid. 602. Testimony outside a witness' personal knowledge is not admissible. See *id.* While it is true that "personal knowledge" includes inferences and opinions, those inferences and opinions

must be grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience.

See *Visser v. Packer Engineering Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir.1991) (affidavits of employees stating that CEO fired plaintiff because of age not admissible under Rule 602 where affiants did not report admissions of CEO about his motives in

firing plaintiff and did not report "primary facts" from which a reasonable person in their position would infer that one of CEO's motives was age). As explained above, there is no evidence that Mr. Smelcer had first-hand knowledge of defendant's alleged reluctance to hire minority contractors. Without such evidence, Mr. Smelcer's bald, conclusory assertions, unsubstantiated with any specific facts, are inadmissible. See *Davis v. City of Chicago,* 841 F.2d 186, 189 (7th Cir.1988) (plaintiff's conclusory assertions regarding an alleged custom and policy of defendant, unsubstantiated with specific facts, "fails to indicate any factual basis which would tend to show that he had personal knowledge of the matter" and thus were inadmissible under Rule 602).

█ In addition to the comments allegedly made by Mr. Smelcer, plaintiffs refer the court to one statement allegedly made by Kevin Neurer to Tom Turner in the early 1990s. At that time, Mr. Neurer was an individual employed by defendant with responsibilities in supply chain management. Mr. Turner testified that Mr. Neurer on one occasion said to him, "Tom, you are having trouble getting work over here because you are a minority contractor." According to plaintiffs, this statement demonstrates that PAS was unsuccessful in obtaining contracts with defendant because of race. Plaintiffs, however, have provided no information concerning the context in which Mr. Neurer's statement was made and have provided no information concerning the basis for Mr. Neurer's statement. In any event, even assuming that Mr. Neurer made this statement,[40] it is not sufficiently connected to the challenged decision to demonstrate

pretext. In other words, to the extent Mr. Neurer's comment was made, it was made several years prior to PAS's attempt to obtain the Las Vegas contract in 1998 (or the 6363 College project in 1999 for that matter). For this reason, no reasonable jury could conclude from Mr. Neurer's statement that defendant denied plaintiffs contracting opportunities based on race during the relevant limitations period. See *Stewart v. Adolph Coors Co.,* 217 F.3d 1285, 1289 (10th Cir.2000) (allegedly racially motivated comment made by decisionmaker three years after challenged action not probative of decisionmaker's motivations in connection with challenged action), *cert. denied,* —— U.S. ——, 121 S.Ct. 774, 148 L.Ed.2d 672 (2001); *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.,* 165 F.3d 1321, 1331 (10th Cir.1999) (holding that alleged discriminatory event which took place three years before challenged action was too remote in time to demonstrate pretext).

*Racial Epithets*

█ Plaintiffs also contend that defendant's racial animus is evident in light of various "racial epithets hurled at certain of the plaintiffs." In response, defendant maintains that the isolated incidents referenced by plaintiffs in their papers are insufficient to support an inference of discrimination and, thus, do not support plaintiffs' section 1981 claims. For the reasons set forth below, even assuming the truth of plaintiffs' evidence regarding racial epithets, such evidence does not tend to show that defendant's procurement decisions with respect to plaintiffs were motivated by race.

---

**40.** Interestingly, the uncontroverted evidence demonstrates that, in fact, PAS was successful in obtaining contracts with defendant in the early 1990s (at the time the statement was allegedly made). As Mr. Turner himself testified, PAS's work with defendant constituted approximately twenty percent of PAS's business from 1990 through 1995. Mr. Turner further testified that PAS did approximately $5 million in work with Sprint during that time frame.

In support of their argument, plaintiffs reference three specific instances in which racial epithets were allegedly used. The first instance is described in the deposition of Ron Langham. Mr. Langham, an employee of Tom and Keith Turner,[41] testified that on one occasion "somebody" asked him "how [he] liked working for the niggers." As defendant points out, however, Mr. Langham also testified that he could not recall whether the person who asked him this question was an employee of defendant and that part of the reason he could not recall the identity of the person was because the incident occurred 11 years ago. This evidence, then, has no relevance to the issue of defendant's racial animus. See *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir.1998) (in order to rely on discriminatory comments, plaintiff must show that the comments were made by a decisionmaker, and that there was a nexus between the discriminatory statements and the employment decision); *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir.1994) (stray remarks, unrelated to the challenged action, are "insufficient to create a jury issue").[42]

The next incident referenced by plaintiffs is described in the deposition of Mr. Turner. Mr. Turner testified that he heard Joe Hamblin, one of defendant's managers who worked with and supervised work done for defendant by PAS, use the word "nigger" on one occasion in 1994 or 1995.[43] According to Mr. Turner, Mr. Hamblin was complaining about work that PAS had done at one of defendant's buildings and said, "Can't these niggers do it right?" Under established Tenth Circuit law, this statement is insufficient to create an inference of discrimination. See *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1206, 1210 (10th Cir.1999) (affirming district court's grant of summary judgment to the defendant on the plaintiff's race discrimination claim despite the fact that the plaintiff's supervisor had referred to the plaintiff as an "incompetent nigger" just two days after terminating the plaintiff's employment). As the Circuit reiterated in Shorter, allegedly discriminatory statements may serve as circumstantial evidence of discrimination only if the plaintiff shows some nexus between the statements and the employment decision. See *id.* at 1209–10 (citations omitted). Here, plaintiffs have not demonstrated the requisite nexus between Mr. Hamblin's alleged race-related remark and any decision made by defendant to cease doing business with PAS. Accordingly, the court must dis-

41. Keith Turner is the brother of Tom Turner.

42. Plaintiffs then say that Bill Egan (who plaintiffs never identify other than to refer to him as a "decision maker") was in the room at the time of the comment and, according to Mr. Langham, he "kind of got a little snicker" out of the remark. Plaintiffs, however, offer no authority suggesting that such conduct, even if true, would be sufficient for a reasonable jury to infer that defendant discriminated against these plaintiffs on the basis of race.

43. Mr. Turner also testified that Mr. Langham had told him that Mr. Hamblin used racial epithets "all the time." Curiously, Mr. Langham testified that he could not specifically recall Mr. Hamblin (or any employee of de-

fendant for that matter) ever using a racial slur. In any event, plaintiffs have not argued that there is an applicable exception to the hearsay rule that would make Mr. Langham's alleged statement to Mr. Turner admissible at trial. Because Mr. Langham's statement constitutes inadmissible hearsay, the court cannot consider Mr. Langham's alleged statement in analyzing the parties' motions for summary judgment. See *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir.1995) (plaintiff's testimony that coworker told her that he heard supervisor use offensive sexual epithet in reference to plaintiff was inadmissible hearsay and court would not consider it in analyzing appropriateness of summary judgment).

regard the comment allegedly made by Mr. Hamblin.

Finally, Mr. Turner recounted in his deposition a reaction that several of defendant's employees allegedly had to seeing Mr. Turner and Kevin Neurer dining together. According to Mr. Turner, Mr. Neurer advised him that some of defendant's employees told him (Mr. Neurer) that he had been "seen out to dinner with a nigger and that nigger was [Mr. Turner], and that ... if he wanted to keep his employment at [defendant], that he should avoid [Mr. Turner] like the plague." According to Mr. Turner, Mr. Neurer did not identify the particular employees who allegedly made these statements. Without any evidence concerning the identity of the employees who allegedly made these statements, plaintiffs cannot demonstrate that the statements were made within the scope of those employees' employment and, thus, Mr. Turner's testimony is inadmissible hearsay.

### Mssrs. Neurer's and Smelcer's Recollection of African–American Firms that Had Done Business with Defendant

According to plaintiffs, defendant's racial animus is evident from the fact that Kevin Neurer and Terry Smelcer, two individuals with procurement responsibilities, could recall in their depositions only a handful of African–American businesses that had done business with defendant during the relevant limitations period. Plaintiffs contend that the "only conclusion" to be drawn from Mssrs. Neurer's and Smelcer's inability to recall more than a few African–American firms is that defendant does not do business with African–American firms "for years at a time." In response, defendant maintains that plain-

tiffs have misrepresented the deposition testimony of Mssrs. Neurer and Smelcer and, in any event, that plaintiffs' evidence in that regard is insufficient to demonstrate that defendant does not award contracts to African–Americans or that defendant discriminates on the basis of race. As set forth below, no reasonable jury could draw an inference of discrimination from the testimony of Mr. Neurer or Mr. Smelcer.

The court begins with Mr. Neurer's testimony. In the deposition excerpt referenced by plaintiffs, Mr. Neurer testified that he was not aware of any African–American firms who provided moving, transportation or construction services to defendant.[44] Mr. Neurer, however, was able to identify by name one African–American consulting firm that had done business with defendant and two African–American firms in wiring and cable installation that had done business with defendant. When asked whether he "would be in a position to know whether [defendant] did business with African–American firms beyond those ... identified," Mr. Neurer replied that he could have requested that information but he did not think that he ever had requested such information "specific to black firms." He further testified that information concerning the identity of African–American firms doing business with defendant was not "readily available."

As defendant argues, no reasonable jury could infer from Mr. Neurer's testimony that defendant in fact has not contracted with African–American firms. First, there is no evidence that Mr. Neurer should have or would have known the identities of African–American firms that had done business with defendant.[45] In fact, Mr. Neurer's testimony suggests that he did

---

**44.** It is unclear why Mr. Neurer was asked specifically about construction services when none of the plaintiffs provides such services.

**45.** There is no evidence, for example, that Mr. Neurer knew the names of any majority-owned companies that had done business with defendant.

not know that kind of information because he never asked for it. Therefore, the mere fact that Mr. Neurer was not able to identify African–American firms that had done business with defendant is not significant. Second, even assuming that Mr. Neurer's testimony was sufficient to suggest that defendant was deficient with respect to the number of contracts it awarded to African–Americans, Mr. Neurer's testimony in no way suggests that such deficiency was due to discrimination. In other words, any deficiency might just as easily be explained by a low number of qualified minority bidders. Thus, without any evidence concerning the number of qualified minority bidders who sought contracts with defendant, no reasonable jury could draw an inference of discrimination from Mr. Neurer's testimony.[46]

In his deposition, Mr. Smelcer was asked to identify African–American companies that provided goods or services to defendant's regional offices in Virginia; North Carolina; Ohio; Pennsylvania; Florida; California; Nevada; Texas; and Georgia.[47] Aside from two firms in Virginia, Mr. Smelcer was unable to identify any African–American firms that had done business with defendant's regional offices. According to Mr. Smelcer, however, he "just [does not] track them by company name or . . . ethnicity groups." Mr. Smel-

cer also testified that he was unable to identify particular African–American firms by name because he does not always see or hear the results of the bid process (i.e., the identity of the successful bidder). Rather, his job is simply to "make the introductions,"—to get the names of minority suppliers to the buyer at defendant. Thus, contrary to plaintiffs' assertion that Mr. Smelcer's deposition testimony "conclusively establishes" that defendant's regional offices "do not utilize any African–American businesses for years at a time," Mr. Smelcer's inability to identify particular African–American firms that have worked with defendant has no bearing on whether defendant in fact contracted with African–American firms.

*Defendant's Failure to Attain Minority Participation Goals*

■■■ Plaintiffs maintain that an inference of discrimination can be drawn from defendant's failure to meet its minority participation goals for federal subcontracting. In that regard, plaintiffs point to defendant's federal subcontracting plan reflecting defendant's goal (for 1996, 1997, 1998 and 1999) of awarding 5 percent of its federal subcontracts to small disadvantaged businesses. Defendant's plan further reflects that defendant did not meet its 5 percent goal in 1996, 1997, 1998 or 1999.[48] Plaintiffs further contend that de-

---

**46.** To the extent plaintiffs would argue that they requested such company-wide information but were denied that discovery by the court, the court would note that plaintiffs did not present to the court these particular excerpts from Mr. Neurer's and Mr. Smelcer's depositions at any time during the discovery period. If, during the discovery period, plaintiffs had come forward with evidence that defendant's supplier diversity managers could not identify any African–American firms with which defendant had done business, such evidence might have suggested to the court that plaintiffs were not seeking to embark on a fishing expedition and the court would have considered broadening the scope of discovery. The court invited plaintiffs to proffer just this

sort of evidence at several points during the discovery portion of the case and plaintiffs repeatedly failed to go beyond generalized assertions to support their requests.

**47.** Mr. Smelcer was initially asked to identify African–American firms providing goods and services to defendant in Kansas City. He identified several such firms and further testified that he knew that several more African–American firms were working at the campus but that he could not "quote [the] names off the top of [his] head."

**48.** According to defendant's plan, defendant awarded 1.6 percent of its federal subcon-

fendant's racial animus can be inferred from defendant's refusal to remedy its repeated failure to achieve its 5 percent goal. In that regard, plaintiffs argue that defendant failed to implement steps recommended by Ralph Moore [49] and encouraged by the Federal Acquisition Regulations. For the reasons set forth below, plaintiffs' evidence concerning defendant's minority participation goals fails to support any inference of discrimination.

The court begins with plaintiffs' evidence concerning defendant's repeated failure to meet its federal subcontracting goals with respect to small disadvantaged businesses. In that regard, plaintiffs point to only one page of defendant's federal subcontracting plan showing that defendant, in each year since 1996, failed to achieve its five percent goal for minority participation in federal subcontracts. As an initial matter, plaintiffs cite no authority for their assertion that defendant's failure to meet its own goals for federal subcontracting with small disadvantaged businesses in general demonstrates racial animus for purposes of plaintiffs' claims that they were denied contracts for particular services. Moreover, neither PAS nor Riteway claims that defendant denied it any federal subcontracts. Finally, defendant's mere failure to achieve its 5 percent goal has little probative value in the absence of any evidence concerning the number of qualified minority contractors that applied for a particular subcontract but were rejected by defendant. See *Kuhn v. Ball State University*, 78

F.3d 330, 332 (7th Cir.1996) (in employment discrimination context, list of persons promoted by University was "next to worthless" without information concerning how many people, of what age, were not promoted). Without such information, the court is unable to draw an inference of discrimination from plaintiffs' evidence. Similarly, the evidence set forth by plaintiffs fails to compare the qualifications and experience of those contractors outside plaintiffs' protected class who were awarded contracts with the qualifications and experience of those individuals within plaintiffs' protected class who were not awarded contracts. See *Doan v. Seagate Technology, Inc.*, 82 F.3d 974, 979 (10th Cir.1996) ("Statistical evidence which fails to properly take into account nondiscriminatory explanations does not permit an inference of pretext.") (citing *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1456 (10th Cir.1994)). In light of these significant flaws, plaintiffs' evidence concerning defendant's federal subcontracting goals simply does not permit an inference of race discrimination.[50]

In any event, as demonstrated by defendant's evidence, the primary reason for defendant's repeated failure to attain its 5 percent goal is that the substantial majority of defendant's expenditures are with large telecommunications companies (of which there is a dearth of minority-owned companies) for infrastructure and equipment rather than service providers. In fact, defendant's evidence shows that eighty-six percent of defendant's annual

---

tracts to small disadvantaged businesses in 1996; 1.6 percent in 1997; 1.4 percent in 1998; and 1.5 percent in 1999.

**49.** Ralph Moore owns RGMA, a consulting firm that advises clients on minority business enterprise issues and evaluated defendant's supplier diversity program.

**50.** To the extent plaintiffs would argue that they requested this type of company-wide in-

formation but the court denied plaintiffs access to it, the court notes that defendant's federal subcontracting plan has been in plaintiffs' possession for some time. Nonetheless, they never presented it to the court in connection with a specific request to explore the facts underlying the particular minority participation percentages reflected in the plan.

spend is with only a handful of vendors-suppliers who produce telecommunications equipment. Charles Moore, for example, testified that defendant might spend "tens and hundreds of millions of dollars" to purchase a particular piece of telecommunications equipment from Lucent Technologies—one of only a handful of suppliers who produce such equipment. By contrast, defendant spends very little for the labor to have that piece of equipment installed by a service supplier. Thus, defendant inevitably spends a great deal more on product than it does on service. Moreover, as Mr. Smelcer testified, because defendant's annual spend is approximately $3 billion, it takes a huge increase in dollars spent with minority contractors to increase the percentage participation of minority contractors even a tenth of a percent. Significantly, plaintiffs direct the court to no evidence controverting defendant's evidence concerning its annual spend. Rather, plaintiffs simply state that if defendant knows that the majority of its spend is with a handful of large telecommunications companies, then it should adjust its minority participation goals downward and "tell the government the truth" instead of continuing to "lie" about its goals. Whether defendant should revise its federal subcontracting goals is beyond the scope of this lawsuit and certainly beyond the scope of plaintiffs' claims that they were denied contracting opportunities based on race. In short, no reasonable jury could conclude that defendant's failure to attain its federal procurement goals with respect to small disadvantaged businesses demonstrates that race played a part in defendant's denial of contracting opportunities to plaintiffs.

Plaintiffs' argument concerning defendant's refusal to remedy its failure to attain the 5 percent goal meets a similar fate. In support of their argument, plaintiffs reference an excerpt from the deposition of Charles Moore. In his deposition, Mr. Moore was asked whether defendant had adopted various strategies identified by Ralph Moore's consulting company (RGMA) for the enhancement of defendant's supplier diversity program. Contrary to plaintiffs' assertion, Charles Moore testified that defendant had implemented most of the strategies identified by Ralph Moore. Thus, plaintiffs' reliance on Charles Moore's deposition is puzzling. Plaintiffs also direct the court to an excerpt from Terry Smelcer's deposition in which Mr. Smelcer testified that defendant had taken steps to try to improve its minority participation percentages in federal subcontracts. In fact, Mr. Smelcer's testimony is supported by defendant's federal subcontracting plan which reflects that defendant's annual spend with small disadvantaged businesses in terms of federal subcontracts increased almost every year from 1995 through 1999.[51] While Mr. Smelcer did testify that he had no knowledge of whether defendant ever entered into joint ventures with minority-owned companies and that to his knowledge defendant never sponsored a mentor protégé program that was tied to the federal government, plaintiffs have offered no evidence suggesting that these programs were recommended by Ralph Moore or encouraged by the Federal Acquisition Regulations.[52] In sum, plaintiffs have sim-

---

**51.** Thus, while minority participation percentages remained somewhat static, the actual dollars spent with minority groups increased. Defendant spent $29.6 million in 1995 with small disadvantaged businesses in terms of federal subcontracts; $36.8 million in 1996; $46.8 million in 1997; $30.2 million in 1998; and $51.4 million in 1999.

**52.** Although plaintiffs assert in their papers that joint ventures and mentor protégé programs are "encouraged" in the Federal Acquisition Regulations, plaintiffs have not cited to a specific provision within those regulations that allegedly encourages these types of programs and the court has found none. While a specific mentor protégé program is discussed in 48 C.F.R. § 19.702(d), this provi-

ply not shown that defendant refused to remedy its failure to meet its federal procurement goals with respect to small disadvantaged businesses.

*Ad Hoc Committee*

. In their motion for summary judgment and in their response to defendant's motions for summary judgment, plaintiffs point to the work of the Ad Hoc Committee as evidence that they, as well as African–Americans in general, were subjected to intentional racial discrimination under section 1981.[53] According to plaintiffs, the Ad Hoc Committee was established to "pre-screen" the qualifications of minority- and women-owned firms seeking to do work on the campus project; the Committee did not review the qualifications of majority-owned firms. Thus, while their argument is not entirely clear, it appears that plaintiffs contend that defendant's racial animus can be inferred from the fact that minority-owned firms were treated differently in the campus procurement process than majority-owned firms. According to defendant, no such inference can be drawn because the Committee was established to increase minority participation at the campus (indeed, leaders of local women and minority contracting organizations were members of the Committee) and, in any event, the uncontroverted evidence demonstrates that all contractors, minority and majority, had to meet the same criteria to be deemed "qualified" for the project. As set forth below, even viewing the evidence concerning the Ad Hoc Committee in the light most favorable to plaintiffs, no reasonable jury could draw

an inference of intentional racial discrimination from that evidence.

In support of their argument, plaintiffs first direct the court to the deposition testimony of Charles Moore, one of defendant's managers of supplier diversity. While Mr. Moore conceded that the Ad Hoc Committee did not review the qualifications of majority-owned firms, he testified that all contractors, majority and minority, had to meet the same three criteria in order to work on the campus project. According to Mr. Moore, all contractors had to be union signatory, had to have a certain bonding capacity, and had to have worked on similar scopes of work. Mr. Moore testified that while the Ad Hoc Committee ensured that minority- and women-owned firms met these three criteria, majority-owned firms had to meet the same criteria. Thus, as Mr. Moore stated in his deposition, the qualifications of minority firms were reviewed by a different body than the qualifications of majority firms, but the qualifications of minority firms were not reviewed under a different standard. In other words, all contractors were subject to the same rules.

The only other evidence that plaintiffs reference in support of their argument is the affidavit of Mike Hughes, a member of the Ad Hoc Committee. Mr. Hughes averred that the Ad Hoc Committee screened minority and women contractors before those contractors were allowed to bid on campus projects and that the Committee did not review the qualifications of majority contractors. He further averred that the purpose of the Committee was to identify MBE and WBE construction com-

sion is no way suggests that such programs are encouraged.

**53.** In their papers, plaintiffs also state that defendant's "policy of establishing a committee to screen only minorities had a disparate impact upon minorities and, in particular,

upon African–Americans." As this court has repeatedly held throughout this litigation, plaintiffs have not pled a disparate impact theory in this case. See, e.g., *PAS Communications, Inc. v. Sprint Corp.*, No. 99–2182 JWL, 2000 WL 1867571, at *4–6 (D.Kan. Dec. 1, 2000).

panies and service providers. To this extent, then, Mr. Hughes' testimony is consistent with Mr. Moore's testimony. Mr. Hughes also averred that African–American contractors and other minority contractors were "treated differently" from other contractors through the "pre-qualification" process of the Ad Hoc Committee. In his affidavit, Mr. Hughes makes no reference to any qualification process for majority-owned firms or any specific criteria used to qualify firms.

Plaintiffs, then, have directed the court to no evidence suggesting that majority-owned firms were subjected to a more lenient standard or qualification process than were minority firms. Stated another way, plaintiffs have failed to demonstrate that minority-owned firms were treated more harshly than majority-owned firms in the campus procurement process. Plaintiffs' evidence merely demonstrates that minority firms were evaluated by a different group than majority firms. In the absence of evidence that the evaluation

process for minorities was substantively different than that for majorities or that the Ad Hoc Committee was established to decrease minority participation at the campus,[54] the mere fact that minority firms were evaluated by a different group is insufficient to demonstrate that defendant harbored an animus against minorities in connection with the campus procurement process.[55]

*William Esrey*

■ In a letter to Reverend Jesse Jackson signed by William Esrey, defendant's Chief Executive Officer, Mr. Esrey stated that defendant "has provided tens of millions of dollars of work to people of color."[56] Plaintiffs contend that this statement somehow evinces a discriminatory animus on the part of defendant because, according to plaintiffs, Mr. Esrey was unable in his deposition to "defend his bold assertion" with specific facts and the record is devoid of any evidence to corroborate his assertion. In response, defendant contends that Mr. Esrey's lack of personal

54. There is no evidence, for example, that the Committee discouraged or prevented any minority contractors from seeking campus contracts. While plaintiffs theorize in their papers that the Ad Hoc Committee essentially "set aside" janitorial contracts for minority contractors, it is uncontroverted that the Ad Hoc Committee had no involvement in selecting janitorial firms because such contracts were on the operational side of the procurement process and operational contracts were handled by defendant. In any event, the only evidence plaintiffs set forth in support of their "janitorial set aside" theory is the affidavit of Mike Hughes. His affidavit, however, fails to explain the basis for his alleged "awareness" that defendant "reserved minority participation to local contracts for the performance of janitorial contracts and supplied." Thus, Mr. Hughes' statement would be inadmissible at trial and, therefore, cannot be considered by the court on summary judgment. See Fed. R.Evid. 602 & 701.

55. In their papers, plaintiffs contend that the Ad Hoc Committee "screened and rejected"

Riteway. To the extent plaintiffs suggest that the Committee rejected Riteway based on race, the suggestion is meritless. According to the uncontroverted testimony of Charles Moore, to the extent the Committee "rejected" Riteway or deemed Riteway to be "unqualified," it was because the Committee only attempted to match potential minority contractors for contracts relating to the construction of the campus, Riteway was "not a construction company," and Riteway did not bid for campus clean-up. Rather, Riteway bid only for campus operation support or ongoing maintenance.

56. Mr. Esrey's letter was written in response to a letter he received from Reverend Jackson in which Reverend Jackson expressed his disapproval of defendant's proposed merger with MCI WorldCom and his opinion that the merger would have a negative impact on African–Americans throughout the country. In his letter, Reverend Jackson also accused defendant of showing a "disturbing failure to award contracts to minority-owned businesses."

knowledge about the basis for the statement is not material to plaintiffs' claims. Defendant further contends that while the record before the court may not demonstrate that defendant did in fact provide tens of millions of dollars to African–Americans, defendant fully complied with its discovery obligations and its failure to provide information to which plaintiffs are not entitled is of no consequence. As set forth below, the court agrees with defendant. Nothing about the statement made by Mr. Esrey would support a jury verdict in favor of plaintiffs on their claims of intentional racial discrimination.

When plaintiffs inquired of Mr. Esrey in his deposition about the basis for his statement, Mr. Esrey testified that he had no independent knowledge of the data supporting the statement and that he relied on members of his staff who prepared the letter for the accuracy of the statement. Mr. Esrey further testified that he could not identify any specific company that defendant contracted with—whether African–American or not. Although plaintiffs argue in their papers that it is "simply not credible" that Mr. Esrey would not know this information, they have no evidence that Mr. Esrey did in fact know the names of specific companies that defendant contracted with. As defendant argues, the mere fact that defendant's CEO is not personally familiar with specific amounts spent by defendant with particular companies cannot support the conclusion that defendant intentionally discriminates against African–Americans on the basis of race. Plaintiffs offer no arguments or authorities suggesting otherwise. As for plaintiffs' criticism that defendant

has failed to "offer proof" to support Mr. Esrey's statement, defendant is correct that it has complied with its discovery obligations. And the court has repeatedly held that plaintiffs are not entitled to company-wide statistical information concerning defendant's supplier diversity. See, e.g., *PAS Communications, Inc. v. Sprint Corp.*, No. 99–2182 JWL, 2000 WL 1867571, at *2–3 (D.Kan. Dec. 1, 2000). Apparently, plaintiffs believe that it is defendant's burden to prove that it does not discriminate against African–Americans. It is not. It is plaintiffs' burden to prove that defendant does discriminate. See *Elmore v. Capstan, Inc.*, 58 F.3d 525, 529 (10th Cir.1995) Thus, the negative inference that plaintiffs draw from defendant's failure to provide evidence supporting Mr. Esrey's statement (i.e., that because defendant has not produced any evidence that it spent millions with African–American contractors, such evidence must not exist and, thus, defendant is obviously discriminating against African–American contractors) is one that no jury would be permitted to make.[57] For the foregoing reasons, plaintiffs' evidence concerning Mr. Esrey is insufficient to withstand summary judgment.

### 4. Plaintiffs' Deliberate Indifference Theory

Finally, plaintiffs argue they are entitled to summary judgment on their claims in light of defendant's "deliberate indifference" to "the fate of African–American minority business enterprises." In response, defendant asserts that plaintiffs' "deliberate indifference" theory is not a viable theory of proof under section 1981 and that, in any event, no reasonable jury

---

**57.** Similarly, plaintiffs maintain that summary judgment in their favor is appropriate (or at the very least that defendant's motions must be denied) because defendant has repeatedly refused to produce evidence that rebuts plaintiffs' allegations that defendant "purposefully and systematically refused to do business with African–American companies in general and these plaintiffs specifically." This argument lacks merit for the same reasons set forth above.

could infer from the facts presented by plaintiffs in connection with their deliberate indifference theory that defendant intentionally discriminated against African–Americans in general or these plaintiffs in particular. As set forth in more detail below, the court agrees with defendant that a showing of "deliberate indifference" is not sufficient to prove intentional discrimination in the context of section 1981. Moreover, even if the court were to accept plaintiffs' "deliberate indifference" theory, no reasonable jury could infer from the facts presented by plaintiffs in connection with their deliberate indifference theory that defendant intentionally discriminated against these plaintiffs. Thus, plaintiffs' motion for summary judgment on this basis is denied and summary judgment in favor of defendant is granted.

In their motion for summary judgment, plaintiffs argue that defendant's "deliberate indifference" is sufficient to establish intentional discrimination for purposes of section 1981. According to plaintiffs, defendant's deliberate indifference is demonstrated by defendant's violation of established practices and procedures found in the Federal Acquisition Regulations (FARs) requiring certain prospective federal contractors to develop a plan for subcontracting with small businesses, small disadvantaged businesses and small women-owned businesses. See 48 C.F.R. § 19.701 et seq. Those federal contractors required to submit a subcontracting plan are further required to make a good faith effort to comply with the subcontracting plan. See *id.* § 19.702(c). Plaintiffs assert that defendant has failed to make the requisite good faith effort to comply with its subcontracting plan and that this "deliberate indifference" to the FARs demonstrates intentional discrimination against African–Americans in general and, thus, intentional discrimination against these plaintiffs in particular.[58]

In support of their deliberate indifference theory, plaintiffs rely primarily on three cases—*Guardians Association v. Civil Service Commission,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983); *Powers v. MJB Acquisition Corp.,* 184 F.3d 1147 (10th Cir.1999); and *Nabozny v. Podlesny,* 92 F.3d 446 (7th Cir.1996). None of these cases supports the conclusion that a showing of deliberate indifference is sufficient to prove intentional racial discrimination in the section 1981 context. Guardians, for example, was a Title VI class action challenging, under a disparate impact theory of discrimination, a "last hired, first fired" policy and several written examinations used by a police department. 463 U.S. at 585, 103 S.Ct. 3221. A majority of the Court in Guardians held that although Title VI itself requires proof of discriminatory intent, the administrative regulations under Title VI incorporating a disparate impact standard are valid. See *Guardians,* 463 U.S. at 584 n. 2, 103 S.Ct. 3221. A different majority, however, held that compensatory relief was not available under Title VI in the absence of proof of discriminatory intent (i.e., in a disparate impact case). See *id.* at 607 n. 27, 103

---

58. Plaintiffs contend that defendant's "bad faith" is evidenced by defendant's "repeated, deliberate and systematic" lies to the federal government regarding its 5% minority participation goal; defendant's failure to submit, for a period of time, certain reports required by the FARs; the lack of "accountability within defendant's diversity procurement program to ensure compliance with federal law"; Charles Moore's lack of knowledge of federal reporting requirements for federal contractors and lack of knowledge of the percentage of African–American businesses doing business with defendant; Mssrs. Smelcer's and Neurer's ability to name "only a tiny number" of African–American businesses doing business with defendant; and Mr. Esrey's lack of knowledge of defendant's degree of compliance with the FARs.

S.Ct. 3221. Guardians, then, has no applicability to plaintiffs' disparate treatment claims and, in any event, fails even to mention any "deliberate indifference" standard.

In Powers, the plaintiff filed suit for disability discrimination under the Americans with Disabilities Act and section 504 of the Rehabilitation Act. See Powers, 184 F.3d at 1149. Following those circuits that have been hesitant to hold section 504 plaintiffs to the "animus" standard as a requisite for compensatory relief in the failure-to-accommodate context, the Tenth Circuit held that intentional discrimination in that particular context can be inferred from a defendant's "deliberate indifference to the strong likelihood that pursuit of its questioned policies will likely result in a violation of federally protected rights." See id. at 1153. In other words, an employer who fails to accommodate a disabled employee might not necessarily harbor any "animus" against the employee because of that employee's disability and might not necessarily harbor any "animus" against disabled persons in general. See id. ("In the context of the Rehabilitation Act, intentional discrimination against the disabled does not require personal animosity or ill will.") (quoting Bartlett v. New York State Bd. of Law Examiners, 156 F.3d 321, 331 (2d Cir.1998)). Nonetheless, that employer can still be held liable for compensatory damages if, in failing to accommodate that employee, the employer is "deliberately indifferent" to its federal obligations to accommodate persons with disabilities. The statutory violation, however, would still be intentional because the employer presumably would have full knowledge of its own discriminatory conduct. This analysis, however, does not carry over to the race discrimination context. While it may be possible to "inadvertently" discriminate against someone on the basis of a disability for failing to accommodate a particular impairment, it is not possible to "inadvertently" discriminate against someone on the basis of race by failing to hire that person based on race. If a decision is made not to hire a particular person because of that person's race, then that decision is, by its very nature, intentional. In short, the "deliberate indifference" standard discussed by the Tenth Circuit in Powers is limited to the rather unique failure-to-accommodate context.

Finally, in Nabozny, the plaintiff filed suit under section 1983 alleging equal protection and due process violations. See Nabozny, 92 F.3d at 449. In analyzing the plaintiff's equal protection claims, the Seventh Circuit noted that the plaintiff, in order to hold the defendants liable under section 1983, had to show that the defendants "acted either intentionally or with deliberate indifference." See id. at 454. This statement by the court is not surprising, as the deliberate indifference standard is one standard used to assess municipal liability under section 1983. See, e.g., Houston v. Reich, 932 F.2d 883, 888 (10th Cir.1991) (municipal liability in section 1983 context may be established when the governing body has delegated its decision-making authority to the official whose illegal conduct caused the harm or when the governing body retains its decision-making authority but exercises it with deliberate indifference to the constitutional rights of those affected by its decisions). Here, of course, there are no questions of municipal liability under section 1983.

In sum, then, plaintiffs have failed to direct the court to any case supporting their contention that a showing of deliberate indifference is sufficient to establish intentional racial discrimination in the section 1981 context. Moreover, the court has not found any cases suggesting that plaintiffs' theory is viable in this context. For this reason, plaintiffs' motion for summary judgment based a "deliberate indif-

ference"˙ theory is denied and summary judgment in favor of defendant is warranted on this theory.

▮ In any event, even if the court were to accept plaintiffs' theory, summary judgment in favor of defendant would nonetheless be appropriate. As stated earlier, plaintiffs' theory is based on defendant's alleged violation of federal regulations regarding minority business participation in federal contracts or, in plaintiffs' words, defendant's "deviation from established practices and procedures" found in the FARs. The Tenth Circuit has certainly recognized that a showing of disturbing procedural irregularities or deviation from internal policies may be sufficient to give rise to an inference of intentional discrimination. See, e.g., *Kendrick v. Penske Transportation Servs., Inc.,* 220 F.3d 1220, 1230 (10th Cir.2000) (plaintiff may make a showing of .pretext with evidence, inter alia, that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances or with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff); *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.,* 165 F.3d 1321, 1328 (10th Cir.1999) (evidence of pretext may include "disturbing procedural irregularities" such as manipulating hiring criteria). Significantly, however, the Circuit has recognized this principle only in cases where the defendant's deviation from a policy or procedure has the purpose and/or effect of disqualifying or "screening out" the person in the protected class from a particular position or terminating the person in the protected class in favor of a

person outside the protected class. See, e.g., *Mohammed v. Callaway,* 698 F.2d 395, 400–01 (10th Cir.1983) (finding that departure from employment criteria set out in job announcement so as to disadvantage minority employee seeking promotion was probative of discrimination). Here, even assuming that defendant failed to follow the FARs by, for example, failing to file certain reports, by failing to achieve its 5% minority participation goal and/or by setting a 5% minority participation goal while knowing that such a goal would be impossible to achieve, there is no evidence that defendant's failures in that regard had the purpose or effect of decreasing minority participation in general or screening out these plaintiffs in particular.[59] In short, no reasonable jury could infer racial animus or intentional discrimination against African–Americans in general or these plaintiffs in particular from defendant's deviation from the FARs. Thus, even if "deliberate indifference" were a viable theory here, the court would nonetheless grant summary judgment in favor of defendant.

## D. Plaintiffs' Title VI Claims

▮ Plaintiffs also argue that defendant violated their rights under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et al., to be free from intentional discrimination "under any program or activity receiving Federal financial assistance," see *id.* § 2000d. As set forth above in connection with plaintiffs' section 1981 claims, the court has concluded that no reasonable jury could infer from the facts presented in the record before the court that defendant intentionally discriminated against plaintiffs. Moreover, plaintiffs have not suggested (and the court has failed to uncover any authority suggesting)

---

**59.** Of course, the FARs cited by plaintiffs govern minority participation in federal contracts. Plaintiffs here do not contend that they were denied subcontracting opportunities in connection with defendant's contracts to provide telecommunication services to the federal government.

that a showing of intentional discrimination for purposes of Title VI is any different from a showing of intentional discrimination for purposes of section 1981. Thus, the fact that defendant is entitled to summary judgment on plaintiffs' section 1981 claims dictates that defendant is also entitled to summary judgment on plaintiffs' Title VI claims.[60]

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs' motion to sanction defendant for failing to make disclosures required by Rule 26, for Rule 37 sanctions, and for leave to open discovery for a limited purpose (doc. # 263) is **denied**; plaintiffs' motion for additional discovery (doc. # 275) is **denied**; plaintiffs' motion for summary judgment (doc. # 229) is **denied**; defendant's motion for summary judgment on plaintiffs' claims for damages (doc. # 231) is **denied as moot**; defendant's motion for summary judgment on plaintiffs' Title VI claims (doc. # 233) is **denied as moot**; defendant's motion for summary judgment against plaintiff PAS Communications, Inc. (doc. # 235) is **granted**; defendant's motion for summary judgment against plaintiff Riteway Magic Supply Company, Inc. (doc. # 238) is **granted**; and defendant's motion for summary judgment against out-of-town plaintiffs (doc. # 241) is **granted**. Plaintiffs' complaint is dismissed in its entirety.

IT IS SO ORDERED.

---

**60.** Defendant has filed a separate motion for summary judgment on plaintiffs' Title VI claims (doc. # 233) on the grounds that defendant does not receive federal financial assistance within the meaning of Title VI. Defendant has also filed a separate motion for summary judgment on plaintiffs' claims for damages (doc. # 231). In light of the court's rulings on defendant's other motions for summary judgment, however, these motions are denied as moot.